Hunt, Appellant, *v.* Aufderheide et al., Appellants.

Argued March 25, 1938. Before KEPHART, C. J., SCHAFFER, MAXEY, DREW, LINN, STERN and BARNES, JJ.

364

*Gifford K. Wright,* of *Alter, Wright & Barron, Albert A. Doub* and *George Cochran Doub,* of *Parker, Carey & Doub,* with them *Maurice Stern, Ralph W. Carson* and *Charles J. Margiotti,* for appellant, in Nos. 26-33, and for appellee, in Nos. 97 and 102.

*S. M. Hazlett,* with him *Edward J. I. Gannon,* of *Hazlett, Gannon & Walter,* for appellant, No. 97.

*J. Roy Dickie,* of *Dickie, Robinson & McCamey,* for appellant, No. 102.

*H. F. Stambaugh* and *J. Garfield Houston,* with them *Ralph H. Demmler, Watson & Freeman, Fred C. Houston, Charles B. Prichard, Blaxter, O'Neill & Houston* and *Rolland H. Ehrman,* for appellees, in Nos. 26-33.

OPINION BY MR. JUSTICE LINN, May 9, 1938:

This is an action by the insurance commissioner, suing in trespass, as statutory liquidator[1] of the Penn-

---

[1] Proceeding pursuant to the Act of May 17, 1921, P. L. 789, Article V, sections 501, 502, 506, 40 PS sections 201, 202, 206. The decree of the Court of Common Pleas of Dauphin County was: "It is hereby ordered, adjudged and decreed that Pennsylvania Surety Corporation, a corporation chartered and existing under the laws of the Commonwealth of Pennsylvania, be and the same hereby is dissolved, its charter vacated and its corporate existence ended, and that the Insurance Commissioner of the Commonwealth be and he is hereby directed to take possession of the property of said defendant, Pennsylvania Surety Corporation, in accordance with the provisions of the Act of the General Assembly of May 17, 1921, P. L. 789, and the said Insurance Commissioner is hereby vested with title to all the property, contracts and rights of action of said corporation as of the date of this order and he is hereby authorized to liquidate the business of said corporation."

sylvania Surety Corporation, hereafter called Surety, against a number of defendants, alleged to have been its directors, to recover losses sustained by Surety "by reason", as the statement avers, "of the negligence and neglect of the defendants and each of them" in the conduct of its business. The jury rendered a verdict for the plaintiff. The court in banc, one judge dissenting, granted the motions of certain defendants for judgment n. o. v. From those judgments the plaintiff has appealed to numbers 26, 27, 28, 29, 30, 31, 32, 33, March Term, 1938. These judgments must be affirmed. The motions of three defendants, J. W. Ward, E. M. Love and the administrator c. t. a. of H. H. Patterson were refused, and after judgments were entered on the verdict, Ward and Love appealed to numbers 102 and 97, March Term, 1938. These judgments must be reversed. The conclusion reached makes it unnecessary now to deal with some of the questions discussed in argument. We shall assume that the right to sue was in the plaintiff.[2]

We observe that the learned trial judge, in his opinion on the motions for judgments n. o. v. said: "There is no contention in this case of wilful fraud, embezzlement or wilful misconduct. Counsel for the plaintiff in his argument to the jury conceded that the directors were honest men, of good business reputation." We begin, then, the review of the record of nearly 3,400 pages, with the assurance of the learned trial judge that wilful fraud, embezzlement and wilful misconduct need not be looked for and that counsel for plaintiff conceded that

---

[2] While the suit is brought in the name of the liquidator, we are advised by a document, excluded when offered, which is the subject of the 33rd assignment of error in the appeal number 102, that an agreement was made with the insurance commissioner by two different bondholders' protective committees, referred to by the learned trial judge in his charge as the Iowa committee and the Chicago committee, in which the members of the committees agreed, inter alia, to prosecute the suit in the name of the plaintiff without liability on his part for costs or expenses.

defendants were honest men of good business reputation.

The general rule in effect at the time (April 1928 to and including part of 1931) was that "The directors of a corporation are required to exercise reasonable and ordinary care, skill and diligence in conducting its business and the failure to observe this standard of care imposes liability on a defaulting director": *Fell v. Pitts,* 263 Pa. 314, 319, 106 A. 574, that is, the care, skill and diligence which the ordinary prudent man would exercise in similar circumstances. See generally, *Cornell v. Seddinger,* 237 Pa. 389, 85 A. 446 (1912); *Loan Society v. Eavenson,* 248 Pa. 407, 94 A. 121 (1915); *Cochran v. Shetler,* 286 Pa. 226, 133 A. 232 (1926); *Cohen v. Maus,* 297 Pa. 454, 147 A. 103 (1929); *Komenarsky v. Brode,* 307 Pa. 156, 160 A. 713 (1932).[3]

---

[3] The same rule has been applied in many other states and in England, where, however, section 372(1) of the Companies Act, 19 and 20 Geo. V, c. 23, contains this provision: "(1) If in any proceeding for negligence, default, breach of duty, or breach of trust against a person to whom this section applies it appears to the court hearing the case that the person is or may be liable in respect of the negligence, default, breach of duty or breach of trust, but that he has acted honestly and reasonably, and that, having regard to all the circumstances of the case, including those connected with his appointment, he ought fairly to be excused for the negligence, default, breach of duty or breach of trust, that court may relieve him, either wholly or partly, from his liability on such terms as the court may think fit."

Since the transactions occurred, the Business Corporation Law of Pennsylvania has been passed and, for corporations subject to the Act, the relation for the future has been stated in section 408 of the Business Corporation Law of May 5, 1933, P. L. 364, 390, 15 PS section 2852-408, as follows: "Relation of Directors and Officers to Corporation.—Officers and directors shall be deemed to stand in a fiduciary relation to the corporation, and shall discharge the duties of their respective positions in good faith and with that diligence, care and skill which ordinarily prudent men would exercise under similar circumstances in their personal business affairs." In the Banking Code of 1933, P. L. 624, 667, section 515, 7 PS section 819-515, the rule was stated for corporations subject to that code.

In most of the cases in this state, decrees in equity were sought to require directors to account and to restore to the corporate treasury sums unlawfully declared and paid as dividends. Surety paid no dividends. In substance, plaintiff, in a suit at law, seeks an accounting from 16 defendant directors and from the personal representatives of three deceased directors. Some were directors during the whole period; some claimed to have been directors during part of it; one denied that he was a director at all; another asserted that he was a director on isolated occasions. The difficulties incident to establishing, in a jury trial, the wrongs charged and, if established, apportioning loss legally resulting from any particular wrong or wrongs against the particular defendant or defendants responsible are obvious. The trial began November 16, 1936, and, with some interruption, ended February 8, 1937. The learned trial judge directed a verdict in favor of two defendants; the jury rendered a verdict in favor of three others but against all the rest in the sum of $1,525,800. The amount of the verdict shows the jury was erroneously instructed on the measure of damages even assuming, contrary to the fact, that plaintiff had established actionable negligence. The suit is brought on behalf of the corporation[4] to obtain the restoration of assets alleged to have been taken from the corporation by the directors' negligence. The corporation could not lose more than it had before the negligent conduct occurred,

---

[4] Article V, section 506 of the Act, 1921, P. L. 808, 40 PS section 206, provides in part: "Section 506. *Orders for Liquidation of Affairs of Companies, Et Cetera; Insurance Commissioner to Act as Receiver.*—If, on a like application and order to show cause, and after a full hearing, the court shall order the liquidation of the business of such company, association, exchange, society, or order, such liquidation shall be made by and under the direction of the Insurance Commissioner, who shall be vested by operation of law with title to all of the property, contracts, and rights of action of such company, association, exchange, society, or order as of the date of the order so directing him to liquidate."

and therefore could not recover more.[5]   The value of its diverted assets marks the maximum of its recovery. While all its assets were liable for its debts, there was no provision in the statute (as appeared, for example, in *Margarge & Green v. Ziegler et al.*, 9 Pa. Superior Ct. 438, and *Miller Paper Co. v. York Coated Paper Co.*, 34 Pa. Superior Ct. 315) imposing liability on shareholders beyond the full paid capital stock.   The learned trial judge submitted damages on the theory that if the jury should find that defendants were negligent in issuing the challenged surety bonds the directors might be held liable for the total of the outstanding liabilities on those bonds, notwithstanding that defendants contributed to the corporation large sums (much greater than the difference between the $2,000,000 total of the assets and the verdict) that will be referred to later.   In view of our conclusion on the main issue, this error in the charge is not now important and is referred to merely that it may not be assumed that the scope of liability imposed is approved.

Proof that the insurance commissioner ordered liquidation because Surety could not meet its obligations is not sufficient to charge the defendants with the loss declared on.   The *res ipsa loquitur* rule does not apply. Before the evidence could be submitted to the jury to determine whether the directors, or, if any, which of them, had failed to do what the ordinary prudent man would have done in the circumstances, and, if so, what recoverable damage was shown, it was necessary that the court be satisfied that there was evidence, if believed, to sustain such findings if made by the jury.   Defendants denied the sufficiency of the evidence and moved for binding instructions; the learned trial judge thought it was adequate as to the defendants now before us and denied the motions; whether his decision on

---

[5] Compare *Bloom v. National United, etc., Co.*, 152 N. Y. 114, 46 N. E. 166; *Niles v. R. R. Co.*, 176 N. Y. 119, 68 N. E. 142.

that point was right or wrong is reviewable and is the principal question now. We are satisfied, taking as true so much of the oral evidence and inferences fairly deducible from it as support the verdict, but, at the same time, considering it, as we must, in the light of, and qualified by, the unchallenged documentary evidence (compare *Evans v. Penn Mutual Life Ins. Co.,* 322 Pa. 547, 555 et seq., 186 A. 133) regardless of which side offered it, that the learned judge's conclusion was erroneous and that he should have granted defendants' motions for directed verdicts.

The Pennsylvania Surety Corporation was incorporated on or about March 28, 1928, under the law of Pennsylvania with an authorized capital stock of 50,000 shares, par $10. This stock was issued at $50 per share, to provide a paid-in capital and surplus of $2,000,000. The history of this corporation shows that, like many other owners of property, it could not survive the rapid decrease in value of property taking place during and following the period it came into existence, so that by January 14, 1931, it was placed in liquidation with assets said to be valued at the time of the trial at $53,130. During that period not only had the $2,000,000 contributed to capital and surplus been lost, but, in addition, the sum of $1,785,000[6] had been contributed in its interest by some of the defendants in their efforts to keep it going.

At the time of organization, the stockholders, as the statute provided, adopted by-laws, one providing that "The board of directors shall meet for the election of officers and for the transaction of business without unnecessary delay after each annual meeting and shall meet thereafter on call of the president who shall give due notice thereof." Another provided: "The Board of

---

[6] Several defendants also contributed $375,000 in cash to the purchase price of Surety's preferred stock in First National Company.

Directors shall elect at its annual meeting from among its own members an Executive Committee of five members." Such a committee was elected: it was composed of five directors who are among the defendants named: J. W. Ward, May, Love, Robinson and Patterson. Another provided: "POWERS. The executive committee shall act only under the direction and the control of the board of directors and subject to such control and direction, and until the board of directors shall otherwise order, it shall have the same powers, rights and duties as the board of directors except that it shall not have the power: (1) to declare dividends; (2) to elect officers; (3) to amend the by-laws; (4) to change the charter of the company; (5) to negative any action of the board of directors." Officers were elected and the corporation transacted the general surety business for which it was organized.[7]

Plaintiff's statement of claim averred "negligence and neglect" in a number of transactions though we shall refer only to those concerning which substantial contention is made in argument: Surety (1) May 1, 1928, executed a re-insurance agreement of risks theretofore insured by the Republic Casualty Company, a company whose relation to the case will be referred to later; (2) on or about April 28, 1928, issued "without official corporate action" a financial statement bearing that date and said to be false; (3) between April 9, 1928, and February 7, 1930, purchased certain securities from First National Company, a Delaware corporation; the relation of this company to Surety will be stated; (4) between April 9, 1928, and February 7, 1930, loaned

---

[7] Its business is thus described in appellant's history of the case: "The Company operated a regular line casualty insurance company issuing all types of casualty, indemnity, automobile, liability, contractors' liability, workmen's compensation, surety, fidelity and other miscellaneous liability policies. It operated in Pennsylvania, New Jersey, Maryland, Ohio, West Virginia, Indiana, Michigan, Illinois, Delaware, etc."

$100,000 "in the interest and for the benefit of the First National Company"; (5) between May 1, 1928, and February 7, 1930, exchanged certain securities with the First National Company; (6) between May 1, 1928, and February 7, 1930, executed certain surety bonds "guaranteeing payment of the principal and interest of mortgages or mortgage bonds in the principal amount of approximately $3,000,000 deposited as collateral for bonds of the First National Company . . ."; (7) made advances amounting to $63,358.01 to five of the defendant directors.

The first thing to be noted, in dealing with the re-insurance, is that the learned trial judge found that it caused no loss to Surety. The risks had been written by Republic Casualty Company, incorporated pursuant to the law of Pennsylvania, while transacting business such as Surety afterward did. The parties who organized Surety, among them defendants, had held a controlling interest in the Republic company, the appellant, J. W. Ward, being president and E. C. Smith, Secretary; Ward afterward became President, and Smith, Secretary and Vice-President of Surety. Early in 1928 it was found that the Republic Company could not continue without additional capital. It had been doing business in a number of states and had contracts and established agencies that would be of value to another company engaged in the same business. The parties interested looked about for a method of salvaging what remained.

The First National Company was a Delaware corporation with its principal business office in Baltimore, Maryland. Plaintiff's witness, Lee, testified: "The First National Company was in a business which was known down in our territory as the mortgage bond business, and the procedure in operation in those indenture [?] was in this fashion: the First National Company would deposit with the trustee mortgages, mortgage bonds, or other qualified collateral which was eligible

under the terms of the trust indenture under which it was deposited. When the trustee received this collateral it would, in turn, at the request of the First National Company, authenticate the First National Company bonds [or collateral notes], which the First National Company would present to the trustee and which bonds the First National Company would sell." In appellant's brief it is said: "Under the Indentures of Trust the collateral for First National Company collateral trust bonds consisted of (a) mortgages or mortgage bonds constituting first liens on fee simple real estate, (b) cash, (c) government bonds, (d) surety bonds of the Metropolitan Casualty Insurance Company or a substitute Surety Company having a capital and surplus of $2,000,000 guaranteeing payment of the mortgages and mortgage bonds, (e) appraisals of J. Henry Strohmeyer, etc." In 1928 the Metropolitan Casualty Insurance Company of New York discontinued writing such insurance. The parties having controlling interests in the Republic and in the First National companies got together and thereafter certain things were done. The Pennsylvania Surety Corporation was organized with the capital and surplus stated. The record contains the certificate of the insurance commissioner of Pennsylvania dated June 12, 1928, reciting the report of the chief examiner of casualty companies in the Insurance Department, and certifying that on April 27, 1928, Surety's capital stock had a book value of $500,000 and that Surety had cash in bank in the amount of $1,-500,000; that an organization had been effected pursuant to the certificate of incorporation, and that Surety was entitled to do business as described in section 202 of Article II, subdivision C, parts 1, 2, 3, 4, 5, 6, 9 and 11 of the Act of May 17, 1921, P. L. 682. This report contained a list of all stockholders with the number of shares issued to them and showed that First National Company held 22,000 out of the 50,000 shares issued and the Republic Casualty Company held 10,000 shares.

This certificate showed that some of defendants had made large investments in the corporation; that E. M. Love had 2,000 shares, H. H. Patterson, 2,000 shares, H. A. May, 2,000 shares, W. H. Robinson, 2,000 shares and J. W. Ward, 2,000 shares in his own name and as trustee 1,610 shares. Each had paid $50 per share into the company's treasury. They were elected and served as members of Surety's executive committee.

On June 11, 1928, the commissioner issued a certificate that he had "ascertained by personal examination that the $500,000 authorized capital of the Pennsylvania Surety Corporation of Pittsburgh, Pennsylvania, has been fully paid up as required by law," whereupon he authorized the company to engage in business as specified above. The commissioner was plaintiff's predecessor in office and had visitatorial powers conferred by the statute.

The re-insurance agreement, averred by plaintiff to have been an "improvident contract," was made with the approval of the commissioner. It was approved at a special meeting of the board of directors on May 1, 1928, and provided that the re-insurance should be effective as of midnight, April 30, 1928. A witness for plaintiff testified that the provisions of the contract were carried out. On the insistence of the commissioner, the agency plant[8] of the Republic Company was

---

[8] Ward's testimony contained this description: "The agency plant consisted of several hundred agents who furnished the Republic Casualty Company with business. Q. Where were they located? A. Oh, they were scattered throughout the United States: Philadelphia, Chicago, Pittsburgh, and other places. He [the insurance commissioner] apparently considered that an asset and he didn't want it left on his hands. In other words, he didn't want to try to dispose of it himself; he wanted us to take it over, and we were glad to take it over, as a matter of fact. Q. Was that a valuable asset, that agency plant and those branches? A. It was. Q. In your opinion what was that worth? A. It was worth considerably more than we paid for it in stock of the Pennsylvania Surety Corporation. Q. How would it be of value to you, in what

purchased by Surety and became part of its business. As negativing the suggestion that it be considered evidence of breach of the directors' duty, it should be said that some of its terms were prescribed by the insurance commissioner after an audit of the affairs of the Republic Company[9] made under his supervision. The learned trial judge found that no damage resulted from the reinsurance. We think this evidence of the re-insurance agreement, from which no loss resulted, should not have been submitted to the jury as evidence that defendants failed to conform to the required standard.

----

way? A. It is a very expensive process to build up an agency plant, and that one was already built. Q. What do you mean by building up an agency plant? A. Going out and getting an agent to finally say, 'I will give you some business,' and then to have him keep on giving it to you, day in and day out, month in and month out. Q. These agency plants, you say, were scattered throughout the United States? A. The agencies were scattered. Q. And had been furnishing insurance business to the old Republic Casualty Company, is that correct? A. That's right. Q. Do you know what amount of premiums that agency plant would bring? A. In the neighborhood of $2,000,000 a year. Q. How do you know that? A. The records will show that. Q. The records of the Republic Casualty Company? A. Yes. Q. Then the new company took over the agency plant? A. That's right. THE COURT: Q. That $2,000,000 a year, is that in business or in premiums? A. That is in premiums."

[9] It may be noted, in passing, that the appellant, Ward, then president of Surety, took advice, as his evidence states, from "the outstanding insurance man in the country from the standpoint of analysis and statistics" who had investigated the re-insurance risk for the purposes of this agreement. In his [Best's] letter to Ward appears the following: "I congratulate you upon the greatly improved results of the underwriting revealed by the tabulations exhibited to me, which show that the business is now on a profitable basis, so that it is not only safe, but desirable, for the new company to take it over. The loss ratio, even in those years, was somewhat high on some of the lines, but in this respect your experience was not different from that of other competently managed companies." We refer to this only for the purpose of showing how the defendants may have been justified in regarding the transaction at the time.

The next item in the complaint is the distribution of a financial statement dated April 28, 1928, showing that Surety had $1,500,000 in cash, and stocks and bonds of $500,000 and that against those resources were charged capital, $500,000, and surplus $1,500,000. Mr. Smith testified that the report was prepared by the treasurer at the direction of the president. Appellant's criticism is that part of the cash had not been actually received but was deposited to Surety's credit with a restriction on its right to use the money. As we understand the record, the evidence showed that two of the deposits, aggregating $150,000 were not, at the moment, subject to check. In the case of the Engineers' National Bank of Cleveland, Ohio, the restriction was that the $50,000 deposit should not be checked out until the First National Company's "loan is paid or other arrangements satisfactory to you are made." A somewhat similar restriction applied to a deposit of $100,000 with the National Park Bank of New York; both deposits were shortly afterward freed from the conditions. Both restrictions were assented to by Surety's vice-president, Smith, in the office of the First National Company in Baltimore. The inaccuracy in the statement is not sufficient to charge the defendants with the liability proposed. We have found nothing in the record indicating that the directors knew of the statement when it was prepared, or that any one other than the officers knew of its distribution; and, as the learned trial judge found that the statement caused no loss, it should not have been submitted to the jury.

The other items grew out of Surety's relations with the First National Company and, with one exception, will be considered together. Surety became a shareholder in the First National Company by purchasing 50,000 shares, par $10, of its 7% preferred stock. This purchase had the approval of plaintiff's predecessor in office, and, at his suggestion, was subjected to an agreement by Surety and the members of its executive com-

mittee; Ward, May, Robinson, Love and Patterson, and by three men from Baltimore, Lindsay, Gill and Shriver, officers of the First National Company, providing that if, after March 30, 1929, the commissioner should require it, they would purchase the stock from Surety at par with interest at 6%, less dividends. On January 31, 1930, after the failure of First National Company, the guarantors, at the commissioner's request, bought the stock from Surety, the five Pittsburgh men paying $375,000 in cash, and the Baltimore men paying in notes, though the accounts would indicate that Mr. Gill paid $5,000 cash. The learned trial judge did not submit this item to the jury.

On behalf of appellant it is contended that Surety's investment in the securities of First National were prohibited by the statute: sections 602, 603, Article VI, Insurance Law, approved May 17, 1921, P. L. 682, 745, 40 PS sections 722, 723; on behalf of defendants, it is urged they were permitted. As appellant's argument does not make clear to us in what respect they were unlawful in the circumstances, and as we have not perceived it, the contention must be rejected. The first investment, $200,000, was approved by resolution of the board of directors at a meeting held May 9, 1928, attended by some, though not all, of the defendants; it was a short term investment maturing in November, 1928. All the other investments, mostly short terms, appear to have been made with the approval of the executive committee. Appellant contends that the defendants should not have made any investment in securities of the First National Company on the ground that its business was speculative. [ Most all business, certainly the surety business, involves speculative elements. The fiduciary character of the directors' relation to the corporation and the measure of their responsibility are quite different from those of a trustee under a will or a deed; such a trustee must preserve the principal for the benefit of remaindermen, and, at the same time, within

the restricted field of investment prescribed by law, obtain income for parties presently entitled. But the assets of a business corporation are held in lighter grasp; shares of stock are taken with notice that the assets shall be employed in making a profit, and that it is customary to take business risks. The ample powers of the executive committee created by the authority of the stockholders have already been referred to. There is no charge that incompetent officers or agents were appointed. There is documentary evidence of the result of prior investigation into the standing and condition of First National Company, resulting in a favorable conclusion. Ward, the president, and the other members of the executive committee considered reports prepared by a certified public accountant (Eder and Company) reporting the balance sheets of the First National Company as of December 31, 1927, June 30, 1928, and December 31, 1928, showing the assets, capital and surplus; the total assets at the end of 1927 were $7,658,333 against a capital and surplus of $2,344,943, whereas a year later the total assets were $9,523,332 against a capital and surplus of $2,586,432. The evidence was that these balance sheets were in the customary form; the reports, which are in evidence, stated that the bonds and mortgages were carried at their face value. A Bradstreet report on First National dated February 6, 1928, appears to have been considered. Defendants put in evidence of other investigation but, as the evidence was oral, we lay it aside.

The testimony relating to the averment that loans, advances and credits were unlawfully made or extended to the First National Company discloses that Surety maintained a running account with the First National Company, with charges back and forth, as transactions from time to time required. We assume that the president, Ward, knew of this account, as he had general executive charge; but there is no evidence that other defendants knew of it; it was not part of their ordinary

duty to make inspections of the books and it does not appear that they were given notice of anything unusual that might require such examination: compare *Cohen v. Maus*, 297 Pa. 454, 147 A. 103; *Bates v. Dresser*, 251 U. S. 524. Moreover, in considering plaintiff's allegations, it is necessary to keep in mind the relations of these two companies. Surety was lawfully organized and engaged in a lawful business; as there is nothing in the record to show that this was not also true of the First National Company, we must assume that it was lawfully incorporated and engaged in a lawful business. Each, then, had authority to own shares or securities of the other. Surety's shareholding, with the agreement by the persons named to purchase the First National shares, approved by plaintiff's predecessor in office, the insurance commissioner, has already been referred to. The result of their intercorporate shareholding brought their business relations into more intimate contact than might have been the case had they sustained no such relation to each other. The loans or advances to the First National Company, appearing in the account, seem to have been repaid, as we understand the exhibits, partly in cash and partly by credits with the exception of a balance, as nearly as we can understand the accounts in the light of the briefs, of about $40,000, obviously not sufficient to charge defendants on the main issue in the circumstances disclosed in the record.

Part of Surety's business was the execution of surety bonds, and it is charged that in becoming surety for the payment by First National Company of its collateral notes or collateral trust bonds, Surety did so without reasonable investigation. As we understand the record, the application for the surety bond in cases involving mortgages was accompanied by real estate appraisement made by appraisers not shown to be incompetent; these appraisements had been acceptable to the Baltimore Trust Company, the trustee. Mr. Smith, Surety's vice-president, "in charge of underwriting," testified: "Q.

Mr. Smith, you were asked yesterday in regard to investigations made of properties securing bonds which were guaranteed by the Pennsylvania Surety Corporation for the First National Company. Isn't it a fact that there were in the files of the Pennsylvania Surety Corporation appraisals covering those properties, which were covered by the bonds? A. That there were appraisals furnished in every case I don't know; there probably were. When they were furnished to us, I can't say. Q. Isn't it a fact that they would be sent with the application for the guaranty bond? A. That would be normal procedure. Q. Isn't it a fact that that was done? A. I don't know that that was done in every instance. Q. It was done in many instances, is that not right? A. Probably was.[10] Q. Some of these bonds were signed by Mr. Ward and some also were signed by yourself, some of these guaranty bonds covering mortgages which are involved in this case, is that not correct? A. Yes, some of those that were introduced here."

Surety was engaged, as has been said, in business of various kinds in a number of states, and plaintiff concedes that with the single exception of part of the transactions with First National Company, conducted its business in the way usual with such companies. In one of appellant's briefs, counsel say: "It is said that these gentlemen [defendants] did not attend to details of the business and, therefore, must be relieved of responsibility. There was no evidence that the ordinary conventional insurance business of this company, such as its workmen's compensation, casualty, fidelity and liability insurance policies, was not competently managed. There is no evidence that there were any unusual losses re-

[10] The statement of claim had attached to it a schedule of the bonds executed by Surety guaranteeing payment of principal and interest of mortgages and mortgage bonds securing certain issues of collateral trust bonds of the First National Company. Defendants put in evidence appraisals accompanying the applications, as we understand it, covering every property listed in the exhibit.

sulting from the ordinary operations of this business with which the directors could not have been expected to be familiar. On the contrary, if this insurance company had confined itself to that business there is no reason why it would not be doing business today. The losses developed in this record resulted from major policies with which the employees had nothing whatsoever to do. . . ." That concession also limits the field of our inquiry.

There is no doubt that, viewed in retrospect, the First National's failure to meet its obligations in January, 1930, placed Surety, which was also subject to the effect of the general destruction of property values incident to the time, in a position that ultimately required liquidation. Some of Surety's business with First National now appears to have been a serious mistake; in the light of the record, we think it was a mistake in business judgment. The burden of proof was on plaintiff. Considering the history of the time, which the court must recognize, the evidence will not warrant a finding that the defendants were negligent according to the standard to be applied. Their conduct must be judged in the light of conditions then prevailing: *Swentzell v. Penn Bank,* 147 Pa. 140, 153, 23 A. 405; *Bailey v. Babcock,* 241 Fed. 501, 514 (W. D. Pa.). The legal authority for the initial and, as subsequent events showed, unwise intercorporate relationship of Surety and the First National Company has been stated. The defendants, especially the members of the executive committee, each with a large capital investment at stake, were vitally interested in conserving it, especially after their experience with the Republic Casualty Company. The evidence is—and it negatives the inference of failure to take adequate care—that the defendants, members of the executive committee, in 1929 made large capital contributions to the enterprise in their efforts to save the business from going the way then traveled by so many other ventures. In April, 1929, the members of

this committee borrowed $1,000,000 for the First National Company out of which it then paid to Surety an indebtedness of $189,039.60. The borrowers lost that $1,000,000 in the failure of both corporations. Another transaction, made to relieve Surety of obligations, was the purchase of what the record calls liquidation claims against Republic Casualty Company; on this account the members of the committee, July 12 and 13, 1929, advanced from their own funds $200,721.51. Mr. Kenmuir, called by the plaintiff, testified this was done "to continue [for Surety's benefit] the business of the customer or the policyholder. . . ." In the course of the liquidation of these claims they received back only 20% of what they paid, thus sustaining additional personal loss of about $160,000. After the "crash" of 1929, in their efforts to save Surety, between March 4 and March 31, 1930, they contributed to it the sum of $625,000. These contributions are important in considering whether defendants performed their duty. If they had been negligent and indifferent, as charged, they would not have sent such large sums of good money after bad; they were not required to contribute them; there is nothing to indicate they were conscience contributions. The record would indicate that if, instead of making these contributions beginning in April, 1929, they had then permitted Surety to go into liquidation, their personal losses would have been less than they were.

The only remaining item that need be referred to is that Surety "between June 26, 1928, and February, 1930, made advances for the benefit of the following directors: H. H. Patterson, Herbert A. May, E. M. Love, W. H. Robinson and J. W. Ward" resulting in "a substantial loss". Loans aggregating $63,358.01 were made to them from June 26, 1928, to November 20, 1929; on June 30, 1930, "The accounts through which the advances were made were closed and the unpaid balance apportioned as follows on the books of the Corporation" in a special account: Herbert A. May $10,877.50, H. H.

Patterson $3,377.50 and J. W. Ward $15,619.17. The same account shows that Robinson had overpaid $81.34 and that E. M. Love had overpaid $1,337. The deficit in this account as stated was therefore $28,455.83. There is no evidence that any of the other directors knew or should have known of the account. Without some notice, the duty of the directors did not require them to find this special account in the company's books as the two cases last cited show. Mr. Kenmuir, in explaining the advances, testified: "The J. W. Ward Trustee Account was used for the purpose of charging into that account interest payments that were made by the Pennsylvania Surety Corporation with several banks covering the note obligations due those banks by Mr. Ward and other directors. Q. What other directors? A. Mr. Robinson, Mr. May, Mr. Patterson and Mr. Love." We are of opinion that on this record judgment cannot be entered against Ward and May for the amounts standing open in that special account. The evidence is that as members of the executive committee they joined in contributing large sums; that part was credited to the surplus account is prima facie no bar to explanation. If, as they claim, they are entitled to set off the contributions against this special account, they should have leave to show it in appropriate actions of assumpsit.

Plaintiff's concession of defendants' integrity has been mentioned. They began in good faith; there is no charge that they employed incompetent officers or agents. Before May 1, 1928, they had satisfied themselves by investigation of the First National Company's standing that profitable business could be conducted with it. They could not make, or be expected to make, an investigation into the affairs of the First National such as was made by the plaintiff's expert accountants who spent over a year going over First National's affairs after its failure. The business relations, so begun, continued during 1928 and into 1929, disclosing progressive weakness on the part of the First National

Company. During that period, as is well known, interest rates and listed stock prices were up and bond prices were down, two conditions seriously affecting the business of both companies. In July, 1929, after the executive committee's loan of $1,000,000 had been put into the treasury of the First National Company, Mr. Smith, Surety's vice-president, made a written report to J. W. Ward saying that the First National's "method of doing business, their organization and the value of their securities were far from good. . . ." He concluded by saying ". . . yet I cannot help but feel that unless we can be shown a quite different picture from that which I have gathered in the past few months, there is no ultimate solution other than liquidation of the First National Company. . . ." Six months later (and, it may be noted, after the market crash of October, 1929) his prediction was verified.

It is clear now, as we have said, that Ward and his colleagues had made a serious mistake considerably over a year before, in concluding that business could profitably be continued with the First National Company in the changing market conditions of that time, but we cannot see that they acted negligently, in the legal sense, in so concluding. Compare *In re Lincoln Market Co.*, 190 Pa. 124, 42 A. 538. At what point prior to Smith's report can it be said they began to be negligent? In April, 1929, they considered their position and their relations with First National sufficiently to feel warranted in raising on their notes the sum of $1,000,000 directly for the benefit of First National and indirectly for the benefit of Surety. In July, still confident, they relieved Surety of the liquidation claims referred to above by paying into its treasury the sum of $207,000, and, in the end, assuming a loss of $160,000. Notwithstanding the great fall in prices beginning in October, 1929, the members of the executive committee in 1930, even after First National went into liquidation, still thought they might save Surety and in March, 1930,

put into its treasury $625,000. These defendants made more than one mistake. It seems clear, in the light of the evidence, given on behalf of plaintiff, of the expert accountants' examination after its failure of the affairs of the First National Company, that defendants were deceived, but being deceived is not necessarily being negligent; the extraordinary capital contributions voluntarily made over the time involved are conclusive against that inference.

Appellant's argument called attention to the fact that these contributions were made by only a few of the defendants; this is true; but they were the defendants who had the largest financial interests at stake, and who, as members of the executive committee, were the most active directors; even if the defendants were regarded as joint tort-feasors (so they were sued) the contributions of one or more would enure to the benefit of all: *Mason v. Lavine, Inc.*, 302 Pa. 472, 475, 153 A. 754. It only remains to add that the legal effect of directors' non-attendance at meetings may be left for consideration when it becomes necessary. See *Bowerman v. Hamner*, 250 U. S. 504; *Warner v. Penoyer*, 91 Fed. 587; *Barnes v. Andrews*, 298 Fed. 614; *Williams v. Brady*, 232 Fed. 740; *Bute's Case* [1892] 2 Ch. 100.

We all agree that the jury should have been instructed that plaintiff had failed to establish the averments of negligence.

In Numbers 26, 27, 28, 29, 30, 31, 32 and 33, the judgments are affirmed.

In Number 97, the judgment is reversed and is here entered for defendant Love.

In Number 102, the judgment is reversed and is here entered for defendant Ward.