In re SIMPLIFIED INFORMATION
SYSTEMS, INC., a/k/a
SIS, Debtor.

SIMPLIFIED INFORMATION SYS-
TEMS, INC., a/k/a SIS, Plaintiff,

v.

Dennis R. CANNON and Robert J.
Barthalow, Defendants.

Dennis R. CANNON, Plaintiff,

v.

Robert J. BARTHALOW, Defendant.

Bankruptcy No. 85–1222.
Adv. Nos. 85–463, 87–245.

United States District Court,
W.D. Pennsylvania.

May 11, 1988.

Bernhard Schaffler, Schaffler & Bohm, Pittsburgh, Pa., for plaintiff/debtor.

Bart J. Tyson, Pittsburgh, Pa., for defendant/Cannon.

Donald J. Barley, Pittsburgh, Pa., for defendant/Barthalow.

## ORDER OF COURT

GERALD J. WEBER, District Judge.

AND NOW at Pittsburgh in said District this 11th day of May, 1988, in accordance with the FINDINGS OF FACT and CONCLUSIONS OF LAW executed Mar 14, 1988 it is hereby ORDERED, ADJUDGED and DECREED that Plaintiff Cannon's Complaint be and is hereby DISMISSED on all counts.

United States Bankruptcy Court Western District of Pennsylvania

### MEMORANDUM OPINION

BERNARD MARKOVITZ, Bankruptcy Judge.

Before the Court are two (2) adversary proceedings consolidated for trial: 1) Debtor's *Complaint to Determine Property of the Estate,* and 2) Cannon's *Complaint for Judgment* against Robert J. Barthalow ("Barthalow"), Debtor's President. In the first action the Debtor asserts that the asset in question, computer software, is property of the Debtor's estate. Cannon challenges that assertion and claims ownership of same. He further contends that the property was only in Debtor's possession as a result of an exclusive licensing agreement. In the second adversary proceeding Cannon accuses Barthalow of breaching his fiduciary duties as a corporate director, wasting corporate assets, and using the corporation as his alter ego. Barthalow challenges Cannon's claims, asserting that he and the Debtor are separate entities, and that in his official capacity, he has exercised care and diligence in the performance of his duties.

Trial was held on February 18, 1988, at which time testimony was heard. Based upon same, and this Court's own research, we find that the computer software constitutes property of the estate. We further find that Cannon's Complaint should be dismissed, as the evidence is woefully insufficient to support the allegations.

## JURISDICTION

Cannon originally disputed this Court's jurisdiction to hear this case. At hearing it was determined that Cannon did not in fact contest this Court's jurisdiction to hear the issues, but rather, questioned whether these issues constitute core proceedings, allowing this Court to enter final judgment; or related proceedings requiring this Court to submit Findings of Fact, Conclusions of Law and a Proposed Order to the District Court for final adjudication. Initially, we note that the question of jurisdiction was determined, at least inferentially, by the District Court, when it granted Defendant's application for removal from state court and referral to the Bankruptcy Court.

This Court has previously discussed jurisdiction in substantial detail, *In re Allegheny Inc.*, 68 B.R. 183 (Bankr.W.D.Pa. 1986). Our previous determinations include the following distinction between core and related matters:

> ... core matters are those which either involve a statutorily-created bankruptcy cause of action, such as recovery of preferential transfers and avoidance of liens; or are required for the orderly reorganization of the debtor-creditor relationship, such as turnover actions and determinations of secured status. Related proceedings, on the other hand, are present whenever
>
> > ... [t]he outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy ... if the outcome could alter the debtor's rights, liabilities, options or freedom of action (either positively or negatively) and which in any way impacts upon the handling and administration of the bankruptcy estate. *In re Bobroff*, 766 F.2d 797, 802 (3rd Cir. 1985) *quoting Pacor Inc. v. Higgins*, 743 F.2d 984, 994 (3rd Cir.1984).

*In re Yobe*, 75 B.R. 873, 875–76 (Bankr.W.D. Pa.1987).

 Having this background against which to measure the present issues, we find that the determination as to whether the computer software is property of the estate constitutes a core matter; the remaining issues, raised by Cannon, i.e. alter ego, breach of fiduciary duty, and corporate waste, are related proceedings. While Cannon's Complaint does not involve a bankruptcy cause of action, clearly the outcome affects the administration of Debtor's estate. Had Cannon succeeded on these claims, and had Barthalow been held jointly and severally liable with the corporation, substantial funds would have been saved for the benefit of other creditors of the estate.

## FACTS

Robert J. Barthalow ("Barthalow") and Dennis R. Cannon ("Cannon") were employees of Control Data Corporation: Barthalow as a financial manager and engineer; and Cannon as a software developer. Nedra Barthalow, Robert's wife ("Nedra"), was employed as a computer consultant and medical records specialist for various health related companies.

Early in 1981 Barthalow approached Cannon with an idea to create and sell computer-based billing/charting systems for use in physicians' offices. The parties met several times to discuss incorporating for this purpose. Concurrently with these discussions, Cannon's position with Control Data was eliminated. Since this radically changed his financial picture, Cannon insisted that if he agreed to this venture, he be permitted to devote time to pursuing other, more immediately lucrative computer opportunities.

The Debtor was incorporated on April 22, 1981. Barthalow and Nedra owned 50% of the corporation and Cannon owned the other 50%. In consideration for such shares, the Barthalows contributed $10,000.00, and Cannon contributed $5,000.00 and an Apple Computer and Printer, with an estimated value of $5,000.00.

On May 29, 1981, two employment contracts were executed: one between the Debtor and Barthalow; the other between the Debtor and Cannon. These contracts were identical, other than the titles bestowed upon the parties: Barthalow as Associate Executive Director, and Cannon as Executive Director. Neither contract con-

tained an explicit "job description"; they stated only that Barthalow and Cannon were to devote their "... full and exclusive time and attention and [their] best efforts to the discharge of [their] duties ..." Plaintiff's Exhibits 2A and 2B.[1] Barthalow and Cannon testified as to what their specific jobs included:

1) Barthalow was to raise capital by locating investors, and to sell the computer hardware and software packages to physicians.[2]

2) Cannon was to take the information offered by Nedra, combine it with his specialized computer skills, and create the computer software to perform the necessary functions.

On June 29, 1981 Debtor registered its stock with the Pennsylvania Securities Commission. Its registration, and stock offering memorandum, both executed by its President, Cannon, certify that its business "... is to develop a simplified computer system for the medical profession, with emphasis on the single doctor practice, to be operated by personnel without data processing background." Plaintiff's Exhibit 4.[3]

Barthalow was still employed by Control Data Corporation, and began depositing substantial portions of his paychecks into Debtor's checking account for Debtor's use. Between August 1981 and June 1982 those moneys were routinely paid to Cannon, as compensation, while he designed the computer software.[4] Barthalow has never received any salary from the Debtor.

### PROPERTY OF THE ESTATE

■ Debtor has asserted that the computer software, created by Cannon, is property of the estate. Cannon argues that Debtor merely possesses an exclusive license to use the software for the life of the corporation, with reversion to Cannon upon corporate dissolution. Cannon bases this assertion upon his claim that Barthalow and he made an oral contract to that effect.

With the exception of certain factors not presently relevant, property of the estate includes "... all legal or equitable interests of the [D]ebtor in property as of the commencement of the case." 11 U.S.C. § 541(a). This also includes both intangible and transitory property. *In re Sheppard's Dental Centers Inc.,* 65 B.R. 274 (Bankr.S.D.Fla.1986); *Glosband v. Watts Detective Agency Inc.,* 21 B.R. 963 (D.Mass.1981). Therefore, software ownership can be property of the estate. However, the parameters of Debtor's interest are determined by state and federal non-bankruptcy law. *Butner v. U.S.,* 440 U.S. 48, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979); *In re Livingston,* 804 F.2d 1219 (11th Cir.1986); *In re William H. Vaughan & Co. Inc.,* 52 B.R. 701, *affirmed* 63 B.R. 438 (E.D.Pa.1986). In the instant case we must turn to federal copyright law in order to determine ownership of the software design.

The right of copyright is statutorily created, and is based upon Article I, § 8, cl. 8 of the U.S. Constitution. *M. Kramer Mfg. Co. v. Andrews,* 783 F.2d 421 (4th Cir. 1986); *Digital Communications Associates, Inc. v. Softklone Distributing Corporation,* 659 F.Supp. 449 (N.D.Ga.1987). The Copyright Act of 1976, as amended in 1980, is codified at 17 U.S.C. § 101 et seq. Section 102(a) states in pertinent part:

---

**1.** On June 19, 1981, the Board of Directors issued a Consent to permit Cannon to engage in other business activities, including computer programming, which *did not compete* with the Debtor's business purposes.

**2.** Nedra was to offer her medical expertise, as it pertained to the utility of the program; she was the only one of the three who knew what procedures would be required in physicians' offices. As she was to act as a consultant, rather than an employee, she did not execute an employment agreement.

**3.** Debtor indicated its intent to copyright this system at the outset; the pendency of same is noted on both the software and the user's manual.

**4.** Anyone interested in a more detailed description of the computer aspects of the case is directed to the seminal opinion on computer software copyright, *Whelan Associates Inc. v. Jaslow Dental Laboratory Inc.,* 797 F.2d 1222 (3rd Cir.1986) which provides a useful introduction to the world of computer software at 1229–31.

§ 102(a). Copyright protection subsists in accordance with this title, in original works of authorship fixed in any tangible medium of expression, now known or later developed, from which they can be perceived, reproduced or otherwise communicated, either directly or with the aid of a machine or device. Works of authorship include the following categories:

(1) literary works; ...

A computer program is a work of authorship and is classified as a literary work for the purpose of obtaining copyright protection. *Whelan Associates Inc. v. Jaslow Dental Laboratory Inc.*, 797 F.2d 1222 (3rd Cir.) *cert. denied*, 479 U.S. 1031, 107 S.Ct. 877, 93 L.Ed.2d 831 (1987); *Digital Communications, supra.*

Section 201(a) of the Copyright Act states that "[c]opyright in a work ... vests initially in the author or authors," and, "[i]n the case of a work made for hire, the employer or other person for whom the work was prepared is considered the author ... [and] owns all of the rights comprised in the copyright" unless otherwise expressly agreed in writing. *Community for Creative Non–Violence v. Reid*, 652 F.Supp. 1453 (D.D.C.1987); 17 U.S.C. §§ 201(b), 201(d), 204(a). Clearly then, the ownership of the copyright depends upon the identity of the statutory "author", which in turn depends upon whether the "work" is a "work made for hire".

A "work made for hire" is "a work prepared by an employee within the scope of his or her employment ..." 17 U.S.C. § 101. Under the Copyright Act, one may be an employee without regard to the method of payment, i.e., salary, piecework, royalty, or gratis, *Community for Creative Nonviolence, supra; Nimmer on Copyright*, § 5.03[B][1][a] (1985). The employer's president may also be considered an employee, *Gallery House Inc. v. Yi*, 582 F.Supp. 1294 (N.D.Ill.1984). Furthermore, the "work made for hire" doctrine is not avoidable merely by performing the work in a separate location, or on non-work time. *Marshall v. Miles Laboratories Inc.*, 647 F.Supp. 1326 (N.D.Ind.1986).

This doctrine does not prevent the employer and employee from forming an agreement to the contrary; the "work made for hire" doctrine creates a presumption in favor of its validity, which can be rebutted only by express written agreement of the parties. *Real Estate Data Inc. v. Sidwell Co.*, 809 F.2d 366 (7th Cir. 1987); *Moran v. London Records Ltd.*, 642 F.Supp. 1023 (N.D.Ill.1986), *affirmed* 827 F.2d 180 (7th Cir.1987).

In the case at bar, Cannon's claim to the software cannot be sustained. The whole purpose for the corporation's formation was the creation and marketing of a computer process which would assist doctors' staffs in their various clerical duties, such as scheduling, charting, and billing. The program written by Cannon was intended to perform these functions.

Cannon was the Debtor's President when he wrote the program; that he wrote it during "off" hours, or at his other business facility is not relevant. Cannon's employment contract required him to devote his time and attention, and his best effort "... to the discharge of his duties." His duty regarding the corporation was to create this software. From August 1981 to June 1982 Cannon received $400.00 per week, to sustain him and his family while he worked on the program. The Board of Directors even consented to his outside employment, so long as it did not interfere with the Debtor's business purpose—the development and marketing of the software for use in physicians' offices.

■ Cannon asserts that an oral agreement to the contrary was reached, creating authorship in Cannon, and an exclusive licensure with the Debtor; however, the Copyright Act requires a *written* agreement between the parties in order to rebut the "work for hire" presumption. There exists no such agreement in this case. To the contrary, the credible evidence presented leads to the conclusion that this software constitutes "work made for hire". As such, the statutory authorship of same goes to the Debtor corporation. Therefore, upon the filing of the bankruptcy petition,

arduino **543**

said software became and is property of the Debtor's estate.

## CANNON'S COMPLAINT

Because the Plaintiff in this adversary proceeding does not consent to this Court's entry of final judgment on these related matters, we submit the following Proposed Findings of Fact and Conclusions of Law. The aforesaid *"Facts"* are incorporated herein by reference with the same effect as if said *"Facts"* were set forth at length.

## FINDINGS OF FACT

1) Plaintiff, Dennis R. Cannon ("Cannon"), was the President of the Debtor corporation from April 1981 until June 1983, and he served as Vice President from June 1983 until his resignation in January 1985.

2) Defendant, Robert J. Barthalow ("Barthalow"), was the Vice President of the Debtor corporation from April 1981 until June 1983, and he has served as President since June 1983.

3) Cannon and Barthalow formed the Debtor to develop and market computer software; Debtor's Offering Memorandum, executed by Cannon as President, states that the business of the company is "... to develop a simplified computer system for the medical profession, with emphasis on the single doctor practice, to be operated by personnel without data processing background."

4) Debtor's initial business address was Barthalow's residence. Thereafter, Debtor leased office space and changed said address. Debtor's bank statements continued to be mailed to Barthalow's home; however, all corporate checks and records were kept at Debtor's office.

5) Barthalow's job was to raise capital by locating investors, and to market the completed computer system to practicing physicians.

6) Cannon's job was to create the computer software.

7) Cannon conditioned his involvement in the corporation upon the Debtor's acquiescence to his employment in computer programming outside the corporation. The Board of Directors consented, provided he *did not directly compete.* Cannon then created CDR Systems, Inc.

8) Barthalow has never received any compensation from the Debtor.

9) In August 1981, Cannon received $2,000.00 in compensation from the Debtor. Thereafter, through the middle of June 1982, Cannon received compensation of $400.00 per week, totaling $12,800.00. These funds were received from moneys deposited by Barthalow, and represent Barthalow's wages from his employment at Control Data Corporation.

10) Between January 1983 and April 1983, Cannon's other business, CDR Systems, Inc., received $4,620.00 for programming services to the Debtor.[5]

11) Between October 1982 and February 1985, Debtor paid CDR Systems, Inc. $30,416.40 for computer hardware and repairs.

12) During the corporation's existence Barthalow has made several loans to the Debtor to keep it operational. To date, none of those funds, totaling over $24,000.00, have been repaid.

13) The first sale of the computer system occurred in December 1982. The sale price was $36,920.00, but was reduced $3,000.00 based upon the physician's willingness to be a "guinea pig" for this prototype system.

14) Substantial problems appeared in the software after it was installed and operating. Over many months of correspondence the Purchaser and his staff questioned, complained, and threatened legal action.

15) Concurrent with said installation, it became apparent that Cannon was spending the majority of his time and effort on

---

5. While the issue is not presently before this Court, we note that Cannon's receipts of payment for services rendered to the Debtor, through his separate corporation, CDR Systems, Inc., may constitute a violation of his agreement not to compete and in fact may have been payment for services which should have been rendered to the corporation by Cannon as Executive Director.

his private computer business, and worked on Debtor's business only sporadically.

16) By 1983 Cannon had essentially ceased his creative involvement; however, the program was still malfunctioning. As a result Debtor found it necessary to hire independent contractors to solve the problems.

17) A second, slightly different prototype system was sold to another doctor in June 1984, again being offered at the $3,000.00 discount.

18) In June 1981, registration was made to the State of Pennsylvania in order for Debtor's stocks to be publicly sold.

19) Barthalow attracted a few small investors, primarily physicians interested in the project.

20) Hesitation by the investors to inject further capital or to encourage other financial backing is traceable to problems with the two original installations.

21) At this juncture Barthalow and Cannon "switched chairs", making Barthalow Debtor's President. Both parties believed that investors would more readily deal with Barthalow if he had the title; practically speaking, the change created no substantial changes.

22) In mid–1983, by vote of the Board of Directors, Cannon was removed as a signatory to the corporate bank account.

23) In October 1983, Barthalow prepared an updated business plan for circulation to perspective investors. Few, if any dollars were realized by this effort.

24) Barthalow's search for capital did realize two (2) small grants to continue the development.

25) Barthalow was advised by Debtor's accountant that another of his client's ("Econocast") was in the business of raising venture capital.

26) Barthalow met with a representative of Econocast, who presented a proposal for the Debtor's capitalization in the form of a public stock offering. Econocast sought a retainer of $25,000.00; however, Barthalow advised that the corporation could only pay $10,000.00 with a note for the remainder.

This proposal was circulated to all directors, including Cannon, and was also reviewed by the Debtor's attorney and accountant.

27) A meeting of the Board of Directors was held in October 1984, at which time the proposal was discussed. The Directors voted to accept the proposal. Cannon was present and cast an affirmative vote.

28) In January 1985, Cannon resigned all of his official capacities, retaining only his stock holdings.

29) In May 1985, upon resolution of the Debtor's Board of Directors, Debtor filed a voluntary Chapter 11 petition.

## CONCLUSIONS OF LAW

1) Pennsylvania law governs issues relating to the internal affairs of the Debtor corporation. Application of state law provides the necessary certainty and predictability of results, and protects the justified expectations of all interested parties. *First National City Bank v. Banco Para El Comercio Exterior De Cuba,* 462 U.S. 611, 103 S.Ct. 2591, 77 L.Ed.2d 46 (1983); *Davis & Cox v. Summa Corporation,* 751 F.2d 1507 (9th Cir.1985); *Treco Inc. v. Land of Lincoln Savings and Loan,* 749 F.2d 374 (7th Cir.1984).

2) The application of the alter ego theory to pierce the corporate veil should only be used by the Court in specific instances: a) to prevent fraud, illegality or injustice; b) to support a public policy; or c) to expose criminal liability. The burden of proof is on the party seeking to pierce the veil, and must be supported by the facts on the record. The general body of Pennsylvania corporate law holds that the corporate entity should be recognized unless specific, unusual circumstances require an exception be made. To do so, this Court must be *convinced* that the individual in control of the corporation used that control for an improper purpose, as an abuse of the immunities connected with corporate entities. *Carpenters Health and Welfare Fund v. Kenneth R. Ambrose, Inc.,* 727 F.2d 279 (3rd Cir.1983); *Publicker Industries, Inc. v. Roman Ceramics Corporation,* 603 F.2d 1065 (3rd Cir.1979); *Zubik v. Zubik,*

384 F.2d 267 (3rd Cir.1967), *cert. denied* 390 U.S. 988, 88 S.Ct. 1183, 19 L.Ed.2d 1291 (1968); *DuSesoi v. United Refining Company*, 540 F.Supp. 1260 (W.D.Pa.1982); *American Kitchen Foods, Inc. v. Hersch Cold Storage Company*, 435 F.Supp. 1127 (W.D.Pa.1977); *In re BDW Associates, Inc.*, 75 B.R. 909 (Bankr.W.D.Pa.1987); *Ashley v. Ashley*, 482 Pa. 228, 393 A.2d 637 (1978); *College Watercolor Group Inc. v. Newbauer*, 468 Pa. 103, 360 A.2d 200 (1976); *Sams v. Redevelopment Authority*, 431 Pa. 240, 244 A.2d 779 (1968); *Gagnon v. Speback*, 389 Pa. 17, 131 A.2d 619 (1957).

3) Those factors which have been considered as indications of alter ego include:

a) failure to observe corporate formalities;

b) nonpayment of dividends;

c) siphoning of corporate funds by the dominant stockholder;

d) nonfunctioning of other officers or directors;

e) absence of corporate records;

f) undercapitalization; and

g) insolvency of · debtor corporation.

*Carpenters Health and Welfare Fund v. Kenneth R. Ambrose, Inc., supra; In re BDW Associates, Inc., supra.*

■ 4) There is no cause to pierce the corporate veil between the Debtor and Barthalow. While the corporation was admittedly undercapitalized, and has been periodically insolvent, the clear weight of the evidence shows that all corporate formalities were followed, the officers and directors participated, in the actual business of the Debtor and/or as consultants, and that the only corporate officer or director to receive *any* of the corporate funds was Cannon himself.

5) Pursuant to Pennsylvania law, officers and directors stand in a fiduciary relationship with the corporation. They are responsible for the proper discharge of their duties in good faith; and must do so with the same degree of diligence, care and skill as that exercised by the ordinarily prudent person in the same or similar circumstances. These officers and directors may bind the corporation by any contract which is within said corporation's express or implied powers, and which they determine is necessary and/or proper to carry out the corporate objectives. In recognition that it is the directors, not the shareholders, who manage the corporation, and that directors must be afforded a wide range of latitude in their handling of corporate business, the courts have developed the "business judgment rule". This rule provides that directors are not liable for honest mistakes of judgment, and presupposes a decision by said directors that is honest and unbiased. *Lewis v. Curtis*, 671 F.2d 779 (3rd Cir.) *cert. denied*, 103 S.Ct. 176 (1982); *Cramer v. General Telephone Electronics Corporation*, 582 F.2d 259 (3rd Cir.) *cert. denied*, 439 U.S. 1129, 99 S.Ct. 1048, 59 L.Ed.2d 90 (1979); *Higgins v. Shenango Pottery Company*, 279 F.2d 46 (3rd Cir.1960); *Enterra Corporation v. SGS Associates*, 600 F.Supp. 678 (E.D.Pa. 1985); *DuSesoi v. · United Refining Company, supra; Bellis v. Thal*, 373 F.Supp. 120 . (E.D.Pa.1974), *affirmed* 510 F.2d 969 (3rd Cir.1975); *In re Anthos Steel and Aluminum Inc.*, 71 B.R. 525 (Bankr.E.D. Pa.1987); *In re Complete Drywall Contracting, Inc.*, 11 B.R. 697 (Bankr.E.D.Pa. 1981); *Wolf v. Fried*, 473 Pa. 26, 373 A.2d 734 (1977); *Selheimer v. Manganese Corporation of America*, 423 Pa. 563, 224 A.2d 634 (1966); 42 Pa.C.S.A. § 8363.

■ 6) Directors and officers of a corporation may be held liable for any loss which the corporation suffers as a result of said officer or director's failure to use reasonable and ordinary skill, care, and diligence in the conduct of corporate business. Cannon bears the burden of proving that Barthalow breached his duty and that his conduct was not in the corporate interest. The burden does not shift to Barthalow to prove the fairness of his actions. To do so would be to require a corporate fiduciary to act as an insurer of corporate profits. Not only must Cannon show that Barthalow breached his fiduciary duty, Cannon must also show that the breach was the proximate cause of Debtor's demise. *Bellis v. Thal, supra; Selheimer v. Manganese Corporation of America, supra; Hunt v.*

*Auferheide et. al.,* 330 Pa. 362, 199 A. 345 (1938).

7) A director's dealings with the corporation are subject to rigorous scrutiny. If his actions are challenged, he must prove good faith and inherent fairness. The test is whether or not under all the circumstances the transaction is handled as if it were an arm's length bargain. *Pepper v. Litton,* 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281 (1939); *Pappas v. Moss,* 393 F.2d 865 (3rd Cir.1968); *Bellis v. Thal, supra; In re Complete Drywall Contracting, Inc., supra.*

8) Barthalow has not breached his fiduciary duty and is not guilty of corporate waste. All testimony provided indicates that Barthalow has made general day-to-day corporate decisions in his capacity as President and that said decisions have been made in good faith. All major decisions, including removal of Cannon from the corporate checking account signature card, and the payment to Econocast, were made on affirmative vote by a majority of the corporate directors. Barthalow has loaned substantial funds to the corporation; said loans are clearly acknowledged on Debtor's financial statements. To date, Barthalow has never received any salary or return on either his loan or his capital investment.

### ORDER OF COURT

AND NOW at Pittsburgh in said District this 14th day of March, 1988, in accordance with the foregoing Memorandum Opinion of this same date, it is hereby ORDERED, ADJUDGED and DECREED that the computer software is property of the estate.