## Carr *v.* Carr O'Brien Company, Appellant.

Argued May 23, 1956. Before STERN, C. J., JONES, BELL, CHIDSEY, MUSMANNO and ARNOLD, JJ.

*Francis T. Anderson,* with him *Gray, Anderson & Schaffer,* for appellants.

*Thomas C. Egan,* with him *Harry Polish,* for appellee.

OPINION BY MR. JUSTICE BELL, September 24, 1956:

The plaintiff, a minority stockholder of Carr O'Brien Company, stock brokers, filed a complaint to prevent the majority stockholders and the officers and directors from fraudulently converting the business to their own use and to the use of a new corporation known as Joseph L. O'Brien Company. He prayed for (1) an injunction restraining defendants from transacting business under the corporate title of Joseph L. O'Brien Company and (2) for a decree directing them to resume and conduct the securities business under the aforementioned corporation, Carr O'Brien Company, or in the alternative giving him the same interest in the new Company as he had in the old Company, and (3) (a) for an accounting and (b) for a receivership of both Companies. In the light of plaintiff's own conduct, some of these prayers were, as we shall see, extraordinary.

Defendants denied the material allegations and the charges of fraud, and averred that "plaintiff's purpose and object in instituting this action and in making the scandalously false statements contained in the complaint are to extort money from the defendants." Testimony was taken, and appraisers were appointed by the Chancellor who approved their report. The Chancellor then, in effect, rejected the report and entered a decree adjudging the defendants to be trustees ex maleficio, and ordering them to account to plaintiff (a) for the property and assets obtained from Carr O'Brien Company and (b) for all profits made by Joseph L. O'Brien Company.

Carr O'Brien Company was incorporated under the laws of Pennsylvania on July 12, 1937, for the purpose of buying, selling and dealing in stocks, bonds and other investment securities. They were, in practical effect, dealers in "over the counter" securities, and dur-

ing the entire existence of the Company their earnings or net income was exceedingly small. The Company had an authorized capital of $52,500., consisting of $25,000. of first preferred stock, $25,000. of second preferred stock, and 500 shares of common stock which had a par value of $5.00 a share. Plaintiff owned 125 shares of common stock; his total investment in the Company was $1,250. for which he now claims $20,000.

Plaintiff, from the time of the incorporation of the Company down to May 4, 1953, was President of the Company and a director. The officers of the Company were active in the business, and each of them received a commission or compensation which was payable, of course, before the net earnings of the Company were determined. As of December 31, 1954, the Company had six employes. At a special stockholders' meeting on May 4, 1953, a new President was elected and plaintiff was not re-elected a director. Thereupon, on May 18, 1953, plaintiff wrote a letter to counsel for the Company demanding that his name be taken out of the corporate name and not be used in connection with the business of Carr O'Brien Company. He then prepared a resolution in writing to have his name taken out of the Company. In addition to the letter and resolution, plaintiff testified that he did not want his name to be used in connection with the business of Carr O'Brien Company because he had lost entire confidence in Mr. O'Brien and he did not want his name to be associated with him. He next withdrew his securities, took with him his list of customers and severed all his connections with the Company. The other officers took their list of customers. It is important to note that this was a tiny "personal service" stock brokerage corporation, and each officer and each salesman had his own customers who with rare exceptions would follow him

wherever he went. Plaintiff then demanded that the Carr O'Brien Company be dissolved and defendants in effect complied with his demand.

As the appraisers found, the successful operation of the Company depended on the advantageous buying of securities by Joseph L. O'Brien and the ability of the salesmen to dispose of such securities within a relatively short time, because the Company's small invested capital would not permit it to have or carry a substantial inventory or portfolio. Based on the Company's record, especially over the last two years, the outlook for future net earnings in any substantial amount was bleak.

The remaining officers and directors of Carr O'Brien Company proceeded to do exactly what plaintiff requested them to do but which he now vigorously complains about, namely, to change the name of the Company, to surrender its license as a dealer and to discontinue its business. The Chancellor found that "The assets of that Company consisted of tangibles and intangibles including licenses to engage in the securities business as a dealer, a place of business, telephone and teletype numbers, offices that were familiar to a list of customers, furniture, fixtures, customers' lists and the good will incident to the conduct of a going business." All of those assets, *such as they were,* were taken over by Joseph L. O'Brien Company at their book value, without payment of any consideration, except that the furniture was sold at book value at a private sale of which plaintiff had no notice.

Plaintiff asked in his Complaint that Joseph L. O'Brien Company transfer to him an amount of stock equivalent to his holdings in the Carr O'Brien Company, but at the trial testified that he did not want any stock of the new Company but wanted only "the value of my stock [in Carr O'Brien Company] and re-

lief from the expense of having to come into court to get it." The book value of his stock which cost him $1,250. was on January 31, 1955, $70.16 per share, or a total of $8,770. He was offered $10,000. for his stock, or in the alternative an equivalent amount of stock in the new Company, but he refused both offers. The only thing that seems certain about the plaintiff's desires or claims or position is that he wants $20,000. for his stock, although he admitted that the $10,000. ($80. a share) which he was offered for his stock "was a good price".

Carr O'Brien Company was never legally dissolved, as it should have been. Its few assets were taken over by the new firm of Joseph L. O'Brien Company at their book value. The members of the new corporation changed the name of the corporation and omitted plaintiff's name as plaintiff requested; and delivered to plaintiff all of the securities owned by him and his wife as he requested. Plaintiff makes much of the fact that the new corporation (1) surrendered the brokerage license of the old corporation and (2) took out a new license to conduct a securities business, and (3) entered into a new lease for the same offices and (4) secured the same telephone number as was possessed by the old corporation. Under all the facts in this case we see nothing in these actions that amounts to fraud, or anything of which plaintiff can now complain. There was we repeat a private sale at book value of a few pieces of furniture which the old corporation possessed, but the furniture sold was trifling and there was no evidence that the sales price was inadequate.

The Chancellor appointed two appraisers who examined and analyzed the books and records of the old corporation, and because of the sale of the common stock of the Company in August, 1953, for $80. a share, fixed a market value of the common stock of the Com-

pany on a going concern basis as of January 31, 1955 at its highest possible price, viz. $80. a share. The appraisers made a careful and sound analysis of the Company and their report was not only fair—it was excellent. Plaintiff filed two exceptions to the appraisers' report as follows:

"1. The appraisers give no value to the item of good will of Carr O'Brien Company as a going business or in liquidation.

"2. In fixing the value of the common stock of Carr O'Brien Company, the appraisers fail to give any consideration to the item of damage for the destruction and usurpation of the business of Carr O'Brien Company by Joseph L. O'Brien Company and the individual defendants."

The first exception is contrary to the facts, and both exceptions are devoid of merit. The appraisers, through several pages of their report, discuss and analyze the item of good will of Carr O'Brien Company as a going business, and point out, inter alia, that for the period 1950 to 1954 inclusive the average net earnings applicable to common stock was *$1,819.61.* "The earnings have steadily declined since 1948, and in the four year period, 1951 to 1954 inclusive, the average net earnings of the Company were only $1,656.82 or slightly more than the preferred dividend requirement . . . . The net operating results show that the Company did not benefit to any great extent from its list of customers. The principal beneficiaries of the customers' list were the salesmen, most of whom were stockholders. During the ten year period, 1945 to 1954 inclusive, average commissions paid to Joseph L. O'Brien (not including his annual salary of $6,000.) were $54,549.61, to Frank J. Keller, $34,426.95 and to Henry P. Carr (for the eight full years of his employment in said ten year period), $11,060.03. . . . The said three stockholders

were the only salesmen employed by the Company during the years 1948 to 1952 inclusive. . . .

"During the ten year period, 1945 to 1954 inclusive, dividends on the common stock were paid in only one year, namely 1948, in the amount of $5,000. The prospects of any dividends being paid on the common stock within a reasonable time are extremely remote in view of the apparent necessity for retaining earnings for additional working capital. . . .

"The operations of this Company indicate that it has been operated on the basis of a personal service company with the income from said services being paid to a great extent to the shareholders as compensation, leaving only a small amount of net income to the Company after the payment of other expenses. This method of operation materially affects any valuation of good will. If only the net earnings of the Company were considered and all other factors excluded, *the good will of the Company on a going concern basis would have no value.** However, the sale of the common stock of the Company in August, 1953 for $80. a share when the book value of the common stock was $67. a share indicates a value for the good will at that time of approximately $6,000. Since the date of that sale, the net earnings of the Company have not shown any material increase and *the prospects for any material increase in said earnings, if the corporation were continued as a going concern, are very remote.* It is the opinion of the appraisers that the fair market value of the common stock of the Company on a going concern basis as of January 31, 1955 is $80. per share. Based on this value of the common stock, the good will of the Company on January 31, 1955 had a value of $3,916.71."

* Italics, ours.

Anyone familiar with the stock brokerage business would know instantly that the good will of such a corporation with such a record would have either no value or practically no value. We have been greatly impressed by the report of the appraisers and believe the plaintiff was given by them the benefit of every item to which he was entitled.

The Chancellor said: "The finding of the appraisers of a fair value of the stock at $80.00 per share or a total valuation of $10,000.00 for the interest of Henry P. Carr is accepted by the Court *as a fair valuation,* although not controlling or conclusive upon plaintiff because of the actions of the defendant which did not afford plaintiff his rights as a minority stockholder under the Business Corporation Law of Pennsylvania." The Chancellor based this latter conclusion upon *Weisbecker v. Hosiery Patents, Inc.,* 356 Pa. 244, 51 A. 2d 811. Neither that case nor the Business Corporation Law of Pennsylvania support the Chancellor in concluding that the individual defendants were trustees ex maleficio of the Carr O'Brien Company, or that plaintiff is entitled to the profits of Joseph L. O'Brien Company or to a receivership. Plaintiff starts from the erroneous premise that a partnership or business corporation must be perpetual and under no circumstances can be dissolved if some of the partners or majority stockholders thereafter start the same kind of business under a new name. This is neither factually nor legally correct. *There was no fraud, no sale of assets to the majority stockholders for an inadequate price, and no overreaching actually or legally.* These stockholders in dissolving Carr O'Brien Company and changing its name acted in good faith and in accordance with the demands of Carr.

An analysis of *Weisbecker v. Hosiery Patents, Inc.,* 356 Pa., supra, demonstrates that it is factually so dif-

ferent from the instant case as to be clearly distinguishable. In that case, minority stockholders filed a bill in Equity to set aside a sale of the assets of the corporation. Plaintiffs averred (1) fraud, (2) that the acts of the defendants, who were officers and directors of the corporation, were planned and executed for the purpose of confiscating all of the corporation's assets for their personal profit, (3) that defendants made material misstatements of fact in order to induce the sale and (4) that defendants bought in the corporate assets for a grossly inadequate price. The lower Court sustained *preliminary objections*: this Court wisely reversed the decree and held that the facts, if proved, would warrant equitable relief. The Court declared that under §1102 of the Business Corporation Law of May 5, 1933, P. L. 364, 15 P.S. 2852-1102, "any business corporation . . . may elect to dissolve voluntarily and wind up its affairs" by a majority vote of its stockholders pursuant to a resolution of its board of directors; and that §408 of Art. IV of the said Act provides that "officers and directors shall be deemed to stand in a fiduciary relation to the corporation and shall discharge the[ir] duties . . . in good faith." We agree with the Court's opinion that ". . . 'The director of a corporation . . . by assuming the office, . . . undertakes to give his best judgment in the interests of the corporation in all matters in which he acts for it, untrammelled by any hostile interest in himself or others; and all secret profits derived by him in any dealings in regard to the corporate enterprise must be accounted for to the corporation': Bird Coal & Iron Co. v. Humes, 157 Pa. 278." The touchstone of the case is well stated on page 251: "The sale is always a question of *good faith; . . .*"

In *Hornsby et al. v. Lohmeyer et al.*, 364 Pa. 271, 72 A. 2d 294, where the question involved the payment

of commissions and bonuses to certain corporate officers, this Court thus aptly commented on the *Weisbecker* case (page 275):

". . . It is true, of course, that majority stockholders occupy a quasi-fiduciary relation toward the minority which prevents them from using their power in such a way as to exclude the minority from their proper share of the benefits accruing from the enterprise. Weisbecker v. Hosiery Patents, Inc., 356 Pa. 244, 250, 51 A. 2d 811, 813, 814."

In our judgment, defendants were not guilty of any fraudulent conduct toward plaintiff, and the majority did not use their power in such a way as to exclude plaintiff from his proper share of the benefits accruing from his interest in Carr O'Brien Company; and if plaintiff ever had any claim against defendants for anything except *the fair value* of his 125 shares of stock in Carr O'Brien Company, namely $10,000., he has lost it by his own conduct.

The decree is reversed. The case is remanded to the Court below with directions to take such further proceedings and to enter such an Order or Decree as it shall deem just and proper, not inconsistent with this opinion. The fees of the appraisers shall be paid one-half by plaintiff and one-half by defendants; the costs of this appeal shall be paid by plaintiff.