Scott, Appellant, *v.* Stanton Heights Corporation.

Argued March 21, 1957. Before JONES, C. J., BELL, CHIDSEY, MUSMANNO, ARNOLD, JONES and COHEN, JJ.

*John A. Metz, Jr.*, with him *Metz, McClure & MacAlister*, for appellant.

*Walter T. McGough*, with him *Leonard L. Scheinholtz*, and *Reed, Smith, Shaw & McClay*, for appellees.

*V. C. Short*, with him *John J. Dougherty*, for appellees.

OPINION BY MR. JUSTICE CHIDSEY, April 26, 1957:

This is an action in equity wherein appellant, a minority shareholder of the defendant corporation which was being dissolved, sought to enjoin the sale of the principal asset of the corporation to a purchasing group.

The Stanton Heights Corporation was organized as a Pennsylvania business corporation in 1947 and ac-

quired the 45 acre parcel of land upon which the Stanton Heights Golf Club was located. The shareholders were largely members of the golf club, and the property was leased to the club at a rental which was to cover the fixed charges and expenses of the corporation. The board of directors of the corporation, seven in number, were all shareholders in the corporation and members of the golf club.

By 1954 the golf club, its only source of income, owed the corporation unpaid rent in the amount of $21,450.92, and on November 1, 1954, the board of directors recommended to the shareholders that the assets be sold and the corporation be dissolved. At their annual meeting on December 8, 1954, the shareholders voted to dissolve the corporation, liquidate its assets and make distribution. At the time of the meeting, V. C. Short, attorney for the corporation, advised that a substantial tax saving would be realized if the plan of liquidation were carried out within one year, thus avoiding a recognition of gain as provided in §337 (a) of the 1954 Internal Revenue Code, 68 A Stat. 106, c736, 26 U.S.C.A. §337 (a).

The directors accordingly contacted several prospective purchasers, but were unable to secure an acceptable offer for the property, which had been appraised at $120,000. Thereupon they solicited sealed bids to be presented on or before February 15, 1955. On February 17, 1955, the board met and considered the four bids which had been received. It voted to accept the highest bid which was an offer of $165,000, submitted by Sauers, the president and a director of the corporation; Totten, a real estate man; and Dodds, an attorney. On February 24, 1955, the corporate officers entered into a written agreement with the three purchasers, whereby the purchasers paid $10,000 hand money and agreed to pay the remaining $155,000 in

cash upon delivery of the deed on or before May 1, 1955. Under its terms the agreement was expressly made subject to ratification by the shareholders, "at a special meeting to be called for such purpose on March 16, 1955", and on February 26, 1955, notices were sent to the shareholders informing them of the special meeting to be held on March 16th for that purpose.

On March 2, 1955, W. Rody Ruttenbusch, an attorney, contacted the treasurer of the corporation and informed him that he represented an undisclosed principal who was willing to make an offer of $175,000 less 5% real estate broker's commission for the property. A consultation was had at that time with the attorney for the corporation, and Mr. Ruttenbusch was advised that his oral offer should be submitted in writing promptly, so that another notice could be sent to shareholders, to give them the required notice of the new offer ten days prior to the already scheduled meeting on March 16, 1955. No written offer was forthcoming, and nothing more was heard from Mr. Ruttenbusch until a few minutes before the March 16th meeting, when he submitted a written offer of $190,000, with $5,000 hand money, to Mr. Sauers, the president of the corporation. Mr. Ruttenbusch, though questioned, refused to disclose the principal or principals for whom he was acting.

When the March 16th meeting actually opened, Mr. Sauers did not act as chairman because he was personally involved in the offer before the shareholders, and it was agreed that Mr. Short, attorney for the corporation, should preside over the meeting. Although Mr. Ruttenbusch was excluded from the meeting because he was not a shareholder, the stenographic record of the meeting shows that his offer was read in full, laid before the meeting, and discussed at length. The attorney for the corporation expressed the opinion that

the only offer which could be voted on at the meeting was the $165,000 offer of the Sauers group, because that was the only one upon which the board had acted and of which notice had been sent to the shareholders. It was made clear, however, that the shareholders could reject the $165,000 offer, and if they did so, then it would be up to the directors to look further into the $190,000 offer, and any other offer that might come along. Thereupon a vote was taken. Of a total of 961 shares outstanding, 844 were represented at the meeting. 699 shares (of which 499 were represented in person and 200 by proxy) were voted in favor of accepting the $165,000 offer, and 145 shares (108 in person and 37 by proxy) were cast against it. 88 of the 145 negative votes were cast by appellant.

It was later discovered that Mr. Ruttenbusch was attorney for a group of three men of whom one was the appellant, Bart J. Scott, a shareholder in the corporation. Appellant sat through the entire meeting of March 16, 1955, but never disclosed that he was one of the principals behind the $190,000 offer, nor did he comment on the offer itself. It may be of significance that his written agreement with his co-adventurers, entered into on March 16, 1955, to make the $190,000 offer, expressly contemplated a minority stockholders' bill to be filed in appellant's name, and that, although Scott was to invest only one-eighth of the purchase price, he was to own one-fourth of the deal if consummated.

On March 19, 1955, appellant commenced this action in equity to enjoin the sale at $165,000. The case was tried before the chancellor who after making findings of fact and conclusions of law, entered a decree nisi dismissing the complaint. Exceptions were argued before the court en banc, and a final decree was entered overruling the exceptions and dismissing the

appellant's complaint. From the final decree, this appeal is taken.

Appellant does not contend that the agreement executed by the directors was void because Sauers, the president and a director of the corporation, was one of the three proposed purchasers. His very able and experienced counsel recognized that this did not make the agreement void since the identity of Sauers as one of the purchasers and the terms of the agreement were known to both the directors and the shareholders. Where the purchaser of property owned by a corporation is an officer or director, the sale is not ipso facto void. The question is whether, despite such relationship, the identity of the purchaser is known and the transaction is fair to all concerned. See *Ashhurst's Appeal*, 60 Pa. 290, frequently cited with approval by this Court, and 24 A.L.R. 2d 71. In the instant case, as the court specifically found, not only was there no evidence of fraud but nothing to indicate that Sauers attempted to influence the board of directors, six out of seven of whom had no interest in the matter other "than their own as shareholders and distributees of the net assets."

Appellant argues that, since the shareholders by vote on December 8, 1954 had elected to dissolve the corporation, the board of directors alone had the duty of selling the corporate assets under Art. XI, Section 1104 C of the Business Corporation Law, Act of May 5, 1933, P. L. 364, 15 PS §2852-1104; that in disposing of the assets the board of directors had the duty of acting ". . . with that diligence, care and skill which ordinarily prudent men would exercise under similar circumstances in their personal business affairs.", Act of May 5, 1933, P. L. 364, Art. IV, §408, 15 PS §2852-408; that they would violate that duty by selling at $165,000 when they knew of an offer of $190,000; and

that the board of directors ". . . cannot hide behind majority shareholders' action to insulate themselves against responsibility to minority stockholders for dereliction of duty.", since, under appellant's reading of the Business Corporation Law, the shareholders' approval was unnecessary.

Assuming arguendo that appellant is correct in his view that Section 1104 C of the Business Corporation Law, supra, made the shareholders' meeting of March 16, 1955 unnecessary,[1] that would not, of course, make the calling of that meeting the breach of duty of which appellant complains. The basic question in this case concerns the propriety of performing the contract to sell the property at $165,000. Appellant poses the question in his brief thus: "Would any ordinarily prudent man sign an agreement for the sale of his own personally owned real estate for $165,000 in the face of the receipt of an offer of $190,000 and without investigating or consideration of that higher offer"?

If we modify that question to conform to the facts in this case, we would have: Would any ordinarily prudent man *perform* an agreement *previously made* for the sale of his own personally owned real estate for $165,000 in the face of the *subsequent* receipt of an offer of $190,000?

The query so attuned to the facts, unquestionably requires an affirmative answer. There is no question but that on February 24, 1955 the board quite properly accepted the best offer that had been hitherto made to them, either by open solicitation or by sealed bid. On

---

[1] Appellees' contention is that the proper procedure for the corporation was under Section 311 B, Article III of the Business Corporation Law, 15 PS §2852-311 B, concerning sales of all, or substantially all, of the corporate assets, not made in the regular course of business, which requires a resolution of the board of directors, notice, and submission of the proposal to a vote of the shareholders.

the 24th of February there is again no question but that they entered into a proper binding written agreement for the sale of the real estate in question to the Sauers group for $165,000, subject only to approval of the shareholders at a meeting to be called on March 16, 1955. Up to this chronological point appellant alleges no wrongdoing, though it may be inferred from his argument that he considers the provision in the agreement for shareholder approval to have been unnecessary. This provision may simply be characterized as an abundance of caution, and it is entirely understandable, particularly when one of the purchasers of the corporate asset is to be the president of the corporation.

The violation of the "reasonable business man" standard of which appellant complains seems to be based on the fact that the board of directors refused to breach an apparently legitimate written agreement, properly executed, because of a "better offer" received almost three weeks after execution of that agreement. This is a remarkable conception of the prudence exercisable by a reasonable business man.

While it would seem unnecessary to go further in reaching our decision, we note that although generally the price in dollars is a prime indicator of the relative worth of an offer, there can be no question but that in a given case other considerations—certainty and promptness of payment; financial responsibility; established legitimate business relationships; the performance of valid legal obligations; tax consequences; and as well business ethics, especially as they apply to accepted business practices such as sealed bids or conduct at open auctions—may weigh much more significantly in the appraisal of the offer which the ordinarily prudent business man would accept than money price alone.

In addition, this being a suit in equity, a glance at the "equities" in the case convinces us that the chancellor and the court below properly found for the defendants. Appellant, as a shareholder, knew for several months that the property was for sale, and waited, through the period of open solicitation of offers, through the period of sealed bids on the property, through the acceptance of another bid by the board, and until a few minutes before final ratification of the existing agreement by the shareholders before making his first written offer. After making the bid through an attorney acting for undisclosed principals, he sat by without making any attempt to enlighten while his fellow shareholders pondered whether to reject what they knew to be a sound agreement in favor of a somewhat more valuable though mysterious "pig in a poke". And while present at the meeting, he apparently sat silently by and did not voice his dissent to the other shareholders, although it is clear that even then he contemplated legal action. Finally, the overwhelming acceptance of the offer by the shareholders after a full discussion of both offers (even discounting the proxies, the "in person" vote was 499 to 108), is indicative, even if we accept appellant's contention as to its lack of legal significance, of the fact that a large number of the "reasonably prudent businessmen" most directly involved financially in this matter voted to accept the $165,000 agreement and approved the board's action. In this connection, it may be noted that, disregarding the shares held by each, a head count reveals that 23 of those actually present voted for accepting the $165,000 agreement while only 4 voted against it. Moreover no stockholder joined in appellant's suit or testified in his behalf.

The appellant would have us ignore these equities, vitiate an apparently binding contract, and disregard

any other business consideration in order to adopt a single standard for the "reasonably prudent business man", to wit, the highest price offered. It is clear that neither the law, nor the businessman acting thereunder operates by that simple single standard. All of the facts surrounding a transaction must be taken into consideration, and looking to all the facts in this case we agree with the chancellor and the court en banc that the board of directors did not act improperly and that the complaint was properly dismissed.

Decree affirmed, with cost on the appellant.