Selheimer, Appellant, *v.* Manganese Corporation of America.

Argued May 2, 1966. Before MUSMANNO, JONES, COHEN, EAGEN, O'BRIEN and ROBERTS, JJ.

*Alexander Conn,* with him *Thomas M. Hyndman,* for appellants.

*Robert S. Grodinsky,* and *Kaplan and Grodinsky,* for appellant, Charles A. Gillan, Jr.

*Charles A. Gillan, Jr.,* for appellant.

*Tom P. Monteverde,* with him *Schnader, Harrison, Segal & Lewis,* for appellee.

*David O. Maxwell,* with him *Herbert A. Fogel,* for appellees.

OPINION BY MR. JUSTICE JONES, November 29, 1966:

These appeals stem from a stockholders' derivative suit in equity instituted by certain stockholders of Manganese Corporation of America (Manganese) against Manganese and Ernest F. Pie, Albert W. Himfar, Nelson Kusner and Charles A. Gillan, Jr., who, at various times, were the officers and managing majority directors of Manganese.[1] After the commencement of this suit in the Court of Common Pleas No. 3 of

---

[1] Two other original defendants, J. A. Morano and D. G. Mazzola, were relieved of liability by the chancellor and are no longer parties to this litigation.

Philadelphia County, Perry N. Selheimer, a director of Manganese throughout the time the corporation was engaged in business activity, was severed as a party plaintiff and joined as an additional defendant.

The thrust of this action is that the four defendants, as officers and majority directors of Manganese, so mismanaged the affairs of the corporation as to result in a wasting of the corporation's assets with a resultant loss to the corporation of approximately $400,000. The case was tried before Judge MAURICE W. SPORKIN of the Court of Common Pleas No. 2 of Philadelphia County, sitting as chancellor,[2] who held the original defendants "guilty of such negligence in recklessly mismanaging the business affairs of [Manganese], wasting its assets and causing its insolvency, as to be legally responsible for its loss and damage totalling $382,537.30. . . ." and directed that the defendants reimburse the court-appointed receiver of Manganese in that amount. Defendants filed exceptions to numerous findings of fact, conclusions of law and the decree of the chancellor. These exceptions were argued before a court en banc—consisting of the chancellor, Judges ETHAN ALLEN DOTY and BERNARD J. KELLEY—which sustained (with Judge SPORKIN dissenting) defendants' exceptions both to the chancellor's conclusion of law that defendants were liable for the loss suffered by Manganese and to the decree nisi and decreed that Manganese' complaint be dismissed. Manganese has appealed from this decree (No. 90 January Term, 1966), and Charles A. Gillan, Jr. has appealed from that portion of the decree dismissing the original defendants' complaint against the additional defendant Selheimer (No. 96 January Term, 1966).

A review of the factual background of this controversy is essential. In March, 1958, the defendants

[2] The record consists of approximately 2,000 printed pages.

Himfar and Kusner formed a corporation known as Mangamex, Inc. (Mangamex) for the purpose of producing manganese oxide at a plant located in Paterson, New Jersey.[3] All Mangamex's capital stock was issued to Himfar and Kusner, Pie and Gillan becoming stockholders at a later date.

In January, 1959, Pie, Gillan, Himfar and Kusner, through nominees, incorporated Manganese as a Pennsylvania corporation. Manganese' capital structure consisted of authorized capital stock consisting of (a) 400,000 shares, Class A stock, having a par value of $2 per share and (b) 200,000 shares, Class B stock, having a par value of 20¢ per share. Of the seven directors authorized, Class B stockholders were entitled to elect four persons as majority directors and Class A stockholders to elect three persons as minority directors. In Manganese' articles of incorporation Pie, Gillan, Himfar and Kusner were designated as its first directors. On January 19, 1959—Manganese' first regular directors' meeting—the directors authorized the purchase from Mangamex of all its assets—evaluated in the agreement at $91,500—which consisted of the lease and *that portion* of the equipment of the Paterson plant which it had purchased six months previously from Eastern. The consideration for this purchase by Manganese was the transfer to Mangamex of *all* Manganese' Class B stock—200,000 shares—and an assumption of all Mangamex's outstanding indebtedness

[3] Prior to March 17, 1958, the U. S. government had leased and operated this plant for "the processing and beneficiating of low grade manganese ore into manganese compounds"; the plant was a "pilot plant designed particularly for operations on a scale which is intermediate between research and full-scale production". Early in 1958, the U. S. government invited bids for the purchase of the equipment and leasehold interest in the plant and Eastern Scrap and Salvage Company (Eastern) acquired *all* the equipment and leasehold interest in the plant. Later, Mangamex purchased the lease and *some* of the equipment from Eastern.

amounting to $10,000.[4]  Subsequent to the completion of this sale and purchase, Mangamex distributed *all* the Class B stock of Manganese to its four stockholders, Himfar, Gillan, Kusner and Pie, each receiving 50,000 shares.[5]

At the same meeting on January 19, 1959, each of the Class B stockholders became an officer of Manganese and an executive committee—to which Pie and Gillan, president and vice-president in charge of operations, respectively, were appointed—was created with authority to exercise all the board of directors' power when the board was not in session.

At the first stockholders' meeting—February 19, 1959—the four defendants were elected majority directors by Class B stockholders and Selheimer, the additional defendant, was elected a minority director by Class A stockholders.

The four defendants, as Manganese' officers, then entered into an agreement with First Securities Commission, Inc., (First Securities), a licensed dealer in securities of which Selheimer was president, for the public offering and sale by the latter of up to 200,-000 shares of Class A stock of Manganese at an offering price of $3 per share.  This agreement provided for a commission to First Securities of $.45 per share sold as well as $.10 per share for expenses; Manganese was thus to receive $2.45 for every share of Class A stock sold.  In order to show cash on hand in Manganese at its inception, the first 40,000 shares of Class A stock were issued to Pie, or his nominees, at their

---

[4] Manganese assumed no responsibility for the issuance by Mangamex of the Class B stock. This agreement was executed for Mangamex by Kusner and Himfar, its president and secretary, and for Manganese by Pie and Himfar, its president and secretary.

[5] Such distribution placed control of Manganese in Pie, Gillan, Kusner and Himfar.

par value of $1. per share. The public offering and sale of Class A stock by Manganese was accomplished *without first registering the issue with the Federal Securities Exchange Commission,* under a procedure made possible by virtue of an exemption provided by the federal "Securities Act of 1933".[6] Such exemption was available if the entire issue of stock would be sold only to Pennsylvania residents *and* if Manganese, incorporated in Pennsylvania, was *actually* "doing business" in Pennsylvania. The total net proceeds realized by Manganese from the sale of Class A stock was $412,914.50. The prospectus and the circulars which accompanied this Class A stock public offering, prepared by and at the direction of Manganese' officers and directors, stated that Manganese proposed to erect and operate a plant in Pennsylvania wherein substantial operating activities would be centered and that Manganese had arranged for the purchase for $100,000 of an ideally located plant at Colwyn, Pa., which would enable Manganese to operate at advantageous freight rates and under other felicitous conditions.

Subsequent to the formal organization of Manganese and prior to the formulation of plans concerning an operating plant, the four defendants, without authorization at a directors' meeting, proceeded to pay themselves salaries out of the proceeds of the sale of the Class A stock. In June 1959—upon a resolution submitted by Selheimer, the additional defendant,—the board of directors voted to discontinue the payment of these salaries and repay that which had been paid. Up to the date of the decree in the court below the

---

[6] The "Securities Act of 1933" exempts from registration securities that are offered and sold to persons resident within a single state and where the issuer is a corporation incorporated and doing business within that state: Act of May 27, 1933, c. 38, Title I, §3(a)(11), 48 Stat. 75, as added to and amended, 15 U.S.C. §77c.

amount of the salaries paid prior to the June, 1959, meeting was never paid back.[7]

On March 13, 1959, Manganese entered into an agreement to purchase for $100,000 a property in Colwyn, Pennsylvania; $10,000 was given as a down payment with final settlement to be consummated on or before September 1, 1959. The Colwyn plant was far better suited and superior to the Paterson plant for the commercial production contemplated by Manganese. The Paterson plant lacked a railroad siding, a proper storage area, and its equipment was "out of phase" or improperly arranged for profitable commercial production. Some of its inadequacies were known by defendants for Pie, in a letter to corporation counsel dated January 21, 1959, stated: "it is mandatory that we leave the plant in N. J. because it has no siding which creates a very expensive operation in the handling of the ore to and from the plant." It is beyond explanation, why, in the face of such knowledge of the unsuitability of the Paterson plant for profitable production, the defendants continued to pour corporate money into and to utilize the Paterson plant. The testimony of defendants is to the effect that they had planned to use the Paterson plant as a "testing" or a "pilot" plant designed particularly for operations in a stage intermediate between research and full-scale production and that to accomplish this it would take the expenditure of approximately $30,000 to $40,000. However, by the time the Paterson plant finally was

[7] Such salaries totalled $13,076.40. As the chancellor stated: "It is axiomatic that the directors and other managing officials of a corporation, as such, are entitled to no compensation for performing the ordinary duties of their office, unless there is an express contract made in advance, or an express provision for compensation appears in the charter or by-laws. Althouse v. Cobaugh Colliery Company, 227 Pa. 580 (1910) ; Grafner v. Pittsburg N. I. & C. St. Ry. Co., 207 Pa. 217 (1903)."

made ready for production in May 1959, over $158,000 had been expended for equipment and the productivity of that plant had been seriously handicapped by the improper arrangement of the equipment purchased. The production at the Paterson plant never exceeded a "token" rate; as of August 31, 1959, the Paterson plant had sustained an operating loss of $104,000 while the total sales of Manganese' products produced up to that date at that plant amounted to $2,000.

When the settlement of the Colwyn property finally took place in August 1959, only $55,000 of the $412,000 realized from the sale of Class A stock, *which in the public offering of such stock had been earmarked for the Colwyn plant,* remained and this amount was patently insufficient to establish the originally projected plant in Colwyn.[8] *The Colwyn plant was never utilized during its ownership by Manganese.* Moreover, even though defendants were fully advised by corporate counsel of the necessity of establishing operations in Pennsylvania in accordance with the SEC exemption, such advice was ignored. When Manganese went into bankruptcy in October 1960 the receiver salvaged approximately $30,000 from the sale of the corporate assets. The record is clear beyond question that the failure of the defendants to utilize the Colwyn plant, where profitable production was possible, and the pouring of Manganese' money into the Paterson plant, which defendants knew could not result in profitable production and which their actual experience in the Paterson plant made so evident, resulted in the ultimate insolvency of Manganese.

The record further reveals that, when, prior to the formation of Manganese, a portion of the equipment at the Paterson plant was acquired by the defendants

---

[8] The cost of establishing the Colwyn plant was estimated to be between $150,000 and $200,000.

acting for Mangamex, such acquisition was through *direct* dealings with Eastern which at the time owned all the "in place" equipment at the Paterson plant. However, subsequent to the formation of Manganese, all purchases of additional "in place" equipment from Eastern were made through an intermediary or "middle man", one Alan Savitt, a personal friend of one of defendants, Himfar. Moreover, two pieces of equipment, thus acquired, for which approximately $4,000 was paid neither appeared on Manganese' inventories nor have they been accounted for. Satisfactory explanation for this conduct does not appear on this record. The chancellor found that the use of the intermediary to purchase the equipment created a "reasonable inference of wilful misconduct and a pattern of self-enrichment by the managing defendants, to the prejudice of Manganese and its stockholders, and militates against their good faith and fair-dealing."

The chancellor found that the conduct of all four defendants could be portrayed "if not as fraudulent, then assuredly as imprudent beyond explanation", and that the "actions of the managing defendants were palpably careless, reckless and wanting in that diligence and skill of reasonably prudent men and not the result of . . . judgment or acts of ineptitude. The acts and omissions . . . are ample . . . to fasten inescapable responsibility on the four defendants who actually had charge of management and conducted the corporation's affairs."

The chancellor further found that Selheimer was not negligent in his duty to exercise care in the conduct of the affairs of Manganese. The record reveals that Selheimer, at various times, expressed concern over the corporation's financial condition and lack of production and that he protested the management of the

corporation, threatened legal action and finally organized the Stockholder's Protective Committee.

The majority of the court en banc agreed with the conclusions of the chancellor that the actions of defendants were "imprudent", "wasteful", "careless" and negligent.[9] Our reading of the opinion of the court en banc indicates that its decree was predicated upon its interpretation of our recent ruling in *Smith v. Brown-Borhek Co.*, 414 Pa. 325, 200 A. 2d 398,[10] an interpretation under which, absent proof of fraud, self-dealing or personal profit or wanton misconduct, directors of a business corporation would not be subject to personal liability, even though their actions were "imprudent", "wasteful", "careless" and "negligent". In our view, the court en banc has misinterpreted *Smith v. Brown-Borhek Co.*, supra.

The yardstick by which the actions of directors of a business corporation is to be measured and the relationship of such directors vis-a-vis the corporation has been mandated by the legislature.

Section 408, of the Business Corporation Law of 1933 [11] provides: "Officers and directors shall be deemed to stand in a fiduciary relation to the corporation, and shall discharge the duties of their respective positions in good faith and with that diligence, care and skill which ordinarily prudent men would exercise under similar circumstances in their personal business affairs." This statute mandates a standard of care for directors much more stringent and harsh than the

---

[9] The majority of the court en banc did not agree with the conclusion of the chancellor that defendants' actions were "wanton acts of omission and commission" because "no criminal act is suggested nor is there any charge of fraud, self-dealing or personal profit."

[10] The decision in *Smith v. Brown-Borhek Co.*, was handed down subsequent to the chancellor's decree nisi but prior to the final decree of the court en banc.

[11] Act of May 5, 1933, P. L. 364, §408, 15 P.S. §2852-408.

standard enunciated by our courts prior to the passage of the statute. Our case law prior to the statute taught .that the directors of corporations—whether business, banking, or otherwise—were held simply to a standard of ordinary care and diligence and that, absent fraud or gross negligence amounting to fraud, such directors would not be personally liable for their actions. The standard prior to §408 might well be stated as that care, skill and diligence which the ordinary prudent man would exercise *in similar circumstances.*

The leading case in this area is *Spering's Appeal,* 71 Pa. 11, 10 Am. Rep. 684 (1872). In *Spering,* Mr. Justice (later Chief Justice) SHARSWOOD stated that directors ought not be judged by the same strict. standard as the agent or trustee of a private estate and ". . . while directors are personally responsible to the stockholders for any losses resulting from fraud, embezzlement or wilful misconduct or breach of trust for their own benefit and not for the benefit of the stockholders, for gross inattention and negligence by which such fraud or misconduct has been perpetrated by agents, officers or co-directors, yet they are not liable for mistakes of judgment, even though they may be so gross as to appear to us absurd and ridiculous, provided they are honest and provided they are fairly within the scope of the powers and discretion confided to the managing body" (at p. 24). In *Swentzel v. Penn Bank,* 147 Pa. 140, 23 A. 405 (1892), creditors of a bank sued to hold its officers and directors liable for losses resulting from the bank's failure.[12] The charge in *Swentzel* was that the officers and directors

---

[12] While the controversy was between the creditors of the corporation and its directors, the court considered "the extent of the duty which the directors of a bank owe to the stockholders, whom they represent directly, and the creditors, whom they represent indirectly." (p. 149).

were negligent in their management of the bank's affairs and that the corporate losses had occurred by reason of that negligence. The Court there held that the care owed by the director of a bank is not the same ordinary care that he takes in his own affairs (at p. 150), stating the rule of ordinary care is not that "ordinary care which a man takes of his own business, but the ordinary care of a bank director in the business of a bank. Negligence is the want of care according to the circumstances, and the circumstances are everything in considering this question." (at p. 150). The Court held that directors, whom the court termed "gratuitous mandatories", are only liable for fraud or for such gross negligence as amounts to fraud.[13]

In *Hunt v. Aufderheide,* 330 Pa. 362, 199 A. 345, we reiterated that, in the period prior to the enactment of §408, the directors of a corporation (bank) were held simply to "the care, skill and diligence which the ordinary prudent man would exercise in similar circumstances" (at p. 366).[14]

In the period subsequent to the statute our attention is directed to only two decisions, *Smith v. Brown-Borhek Co.,* and *Otis & Co. v. Pennsylvania R. Co.,* 61 F. Supp. 905 (E.D. Pa.) (1945). We shall discuss, infra, the former. In *Otis,* the Court stated that, while the extent to which §408 of the Business Corporation Law changed the prior law was "uncertain", however, "the test of liability can hardly be different from that

---

[13] BOWEN, L. J., in *In re North Australian Territory Co.,* 1 Ch. 322, 341 (1892) said: "the director is really a watch-dog, and the watch-dog has no right, without the knowledge of his master, to take a sop from a possible wolf."

[14] In a footnote (at page 366), the Court noted that, since the transactions considered in *Hunt* had occurred, the Business Corporation Law of 1933 had been passed and that "the relation [between director and stockholders] for the future" has been stated in §408 of that statute.

applied in Hunt v. Aufderheide [supra]," i.e., directors are held to the degree of care " 'which the ordinary prudent man would exercise in similar circumstances' " (pp. 910, 911).

To what, if any, extent has §408 changed the law prior to its passage? An examination of §408 reveals two significant facts: (a) that the relationship between directors and officers vis-a-vis the corporation is termed a "fiduciary relation";[15] (b) that the standard of care mandated is that directors act in good faith *and* exercise such care as the "ordinarily prudent man" would exercise under similar circumstances *in their personal affairs.*[16]

While our own case law is not marked with outstanding clarity on the general subject, it is clear

---

[15] Our case law prior to 1933 reveals considerable confusion in the description of the status of directors to the corporation: (1) directors occupy "positions of trustee" (*Glenn v. Kittanning Brewing Co.*, 259 Pa. 510, 516, 103 A. 340; *Law v. Fuller*, 217 Pa. 439, 440, 66 A. 754); (2) directors are "trustees or quasi trustees" (*Hechelman v. Geyer*, 248 Pa. 430, 431, 94 A. 188; *Cornell v. Seddinger*, 237 Pa. 389, 396, 85 A. 446); (3) directors are not "trustees" but occupy a "fiduciary relationship" (*Dubbs v. Kramer*, 302 Pa. 455, 457, 153 A. 733; *Bailey v. Jacobs*, 325 Pa. 187, 194, 189 A. 320; (4) directors are not technically "trustees" but "gratuitous mandatories" (*Spering's Appeal*, 71 Pa. 11, 20, 21; *Watts's Appeal*, 78 Pa. 370, 392). For excellent discussion, see: "Pennsylvania Banking and Building & Loan Law", Segal, Vol. 1, §402, pp. 362, 363.

[16] Our case law, prior to 1933, reveals a gradual extension in the standard of care required: (a) directors are bound "to apply ordinary skill and diligence, but no more"; (*Spering's Appeal*, supra, p. 21; *Watts's Appeal*, supra, p. 392); (b) directors are liable only for fraud or such gross negligence as amounts to fraud; (*Swentzel v. Penn Bank*, 147 Pa. 140, 152, 23 A. 405; *Hibernia Building Ass'n v. McGrath*, 154 Pa. 296, 304, 26 A. 377); (c) directors are held to "but ordinary skill and diligence and are personally liable only when they are guilty of fraudulent conduct or of acts clearly ultra vires" (*Commonwealth ex rel. v. Anchor B. & Loan Ass'n*, 20 Pa. Superior Ct. 101, 109).

beyond question that "[t]he fiduciary character of the directors' relation to the corporation and the measure of their responsibility are quite different from those of a trustee under a will or a deed; . . . ." *Hunt v. Aufderheide, supra,* pp. 376, 377; *Smith v. Brown-Borhek Co., supra,* p. 333.[17] The "fiduciary relation" contemplated by §408, *supra,* would seem to equate that concept well-expressed in *Schaffhauser v. Arnholt & Schaefer Brewing Co.,* 218 Pa. 298, 301, 67 A. 417 (1907): "While it may not be legally accurate to say that a director of a corporation is a trustee for the entire body of stockholders, within the exact meaning of that term, there can be no doubt he does occupy such a fiduciary relation as to imperatively demand, both in good morals and sound law, that he shall manage the business of the company in such a manner as to promote, not his own interests, but the common interests of all the shareholders." See also: *Weisbecker v. Hosiery Patents, Inc.,* 356 Pa. 244, 250, 51 A. 2d 811 (1947); *Hornsby v. Lohmeyer,* 364 Pa. 271, 275, 72 A. 2d 294 (1950).

In construing §408 we bear in mind certain background: (1) the phrase "in their personal affairs" is not to be found in the Uniform Model Business Corporation Act (9. U.L.A. p. 186 et seq.) but was inserted in §408 at the suggestion of a committee of the Pennsylvania Bar Association "Pennsylvania Banking and Building & Loan Law", Segal, Vol. I, §402, p. 362); (2) prior to the adoption of §408, our case law had rejected the standard of care expressly provided in §408;[18] (3) the standard of care in

---

[17] "The duty of loyalty owed by a trustee to his beneficiaries, for example, ordinarily is *more intense* than that owed . . . by a corporate director to the corporation": (Emphasis supplied). Scott on Trusts, Vol. 4, §495, p. 3216.

[18] In *Swentzel v. Penn Bank,* 147 Pa. 140, 150, 23 A. 405, this Court, after referring to *Spering's Appeal,* 71 Pa. 11 wherein "the

§408 does not represent the majority view (see, for example, *Briggs v. Spaulding*, 141 U. S. 132, 11 S. Ct. 924, *Stone v. Rottman*, 183 Mo. 552, 82 S.W. 76, *Forest of Dean Coal Mining Co.*, 10 Ch. Div. 450, 451) ; (4) §408 imposes on a director of a *business* corporation a much *higher* degree of care than the law imposes on a director of a banking corporation [19] or a director of a building and loan corporation.[20]

In recent years, with one exception,[21] this Court has not been called upon to squarely meet the issue of the standard of due care imposed in §408.[22] The wording of §408 is clear and unequivocal and the test therein imposed in evaluating the business corporation directors' actions is mandated by the legislature. The rule is harsh and strict and it may well render unattractive positions as directors of business corporations. Nevertheless, the legislature has spoken on the subject

rule of ordinary care is laid down", stated: "Not, however, the ordinary care which a man takes of his own business, but the ordinary care of a bank director in the business of a bank. . . . The ordinary care of a business man in his own affairs means one thing; the ordinary care of a gratuitous mandatory is quite another matter." See also: *Hunt v. Aufderheide*, supra, p. 366.

[19] Banking Code, Act of May 15, 1933, P. L. 624, §515, 7 P.S. §819-515 which requires such care as "ordinarily prudent men would exercise under similar circumstances in like position". See also: Banking Code, Act of November 30, 1965, P. L. 847, §1411.

[20] Building and Loan Code, Act of May 5, 1933, P. L. 457, §1 et seq., 15 P.S. §1074-1 et seq. contains no provision concerning the relationship of officers and directors to such association.

[21] In *Scott v. Stanton Heights Corporation*, 388 Pa. 628, 634, 635, 131 A. 2d 113, the Court did apply the statutory standard.

[22] In *Zampetti v. Cavanaugh*, 406 Pa. 259, 266, 267, 176 A. 2d 906, the majority directors acknowledgedly had violated §408 by self-enrichment. In *Rivoli Theatre Co. v. Allison*, 396 Pa. 343, 345, 346, 152 A. 2d 449, the managing officer had enriched himself at the corporation's expense and the question of negligence was not at issue. In *Carr v. Carr O'Brien Co.*, 386 Pa. 196, 204, 205, 125 A. 2d 607, the Court dealt with questions of fraud, self-dealing and good faith.

and we are bound to follow the legislative direction, regardless of our own doubts as to the wisdom of the rule. Any change must emanate from the legislature and not the judiciary.

In our view, however, regardless of whether we follow the statutory rule or the rule enunciated in our case law prior to the statute, the same result follows in the case at bar.

In view of the emphasis placed by a majority of the court en banc on *Smith v. Brown-Borhek Co.,* 414 Pa. 325, 200 A. 2d 398 and its conclusions that *Smith* compelled a finding that the defendants could not be held personally liable, we must analyze *Smith.*

In *Smith*—decided solely on the pleadings—a minority stockholder of a business corporation instituted a derivative action against the officers and directors of the corporation to recover a corporate loss, allegedly resulting from negligent mismanagement. The particular conduct of which complaint was made was that the defendants, over a two year period, had extended credit to a customer whom the defendants knew or should have known was not a good credit risk, that the customer went bankrupt and that a loss was sustained by the corporation. Subsequent to the institution of suit, a stockholders' annual meeting was held and, at that meeting, the stockholders, by a vote approximately in the ratio of 15-1, ratified the actions of defendants in handling the customer's account. As a reading of *Smith* clearly indicates two questions were raised: (1) whether the actions of defendant directors *could be* ratified; (2) whether such actions were *legally* ratified. In determining the first issue, the Court noted that there was no allegation of "fraud, self-dealing, personal profit or intentional dissipation or waste of corporate funds" nor any charge of "affirmative negligence or the deliberate exercise of bad judgment or intentional wrongdoing" but simply a

charge that defendants negligently failed to exercise their duties, i.e., passive negligence. Under such circumstances, the Court held that the defendants' actions could be ratified, as they were, by the stockholders.[23] The discussion of the second issue, i.e., the legality of the ratification, is completely inapposite to the case at bar since herein ratification was neither alleged nor proven. A study of *Smith* completely negatives the conclusion of the majority of the court en banc that "the present case is controlled by Smith v. Brown-Borhek, supra."

Returning to the findings in the court below, the chancellor found that the losses of Manganese and its insolvency "were the result of imprudent, wasteful, careless, negligent and wanton acts of omission and commission by all [four defendants] in their management of the affairs of Manganese." The court en banc, even though it disagreed with the chancellor's findings of "wanton acts of omission and commission" and even though it found no fraud, self-dealing or personal profit gained, *expressly approved* the chancellor's findings that the defendants' actions were "imprudent", "wasteful", "careless" and "negligent" and added that there "is no question that the officers were unwise and imprudent in many respects". The question is squarely raised: in the absence of fraud, self-dealing, or proof of personal profit or wanton acts of omission and commission, are the directors of a business corporation, who have been imprudent, wasteful, careless and negligent, personally liable, under either the common law or §408, where such actions have resulted

[23] The Court noted (p. 331), by its approval of the language in *Lowman v. Pierce Co.*, 276 Pa. 382, 386, 120 A. 404, that a ratification could not have excused directors' actions in dissipating or wasting corporate funds or in fraudulently disposing of them in any way.

in corporate losses resulting in the insolvency of the corporation? An affirmative answer is self-evident.

The rule is well settled that "[c]ourts are reluctant to interfere in the internal management of a corporation, since that is a matter for the discretion and judgment of the directors and stockholders, unless a minority stockholder's rights are jeopardized or injured by fraud or *waste of* company assets, or an overreaching, actual or legal: [citing authorities].": *Chambers v. Beaver-Advance Corp.*, 392 Pa. 481, 489, 140 A. 2d 808 (1958) (Emphasis supplied); *Bowman v. Gum, Inc.*, 327 Pa. 403, 193 A. 271 (1937).

In determining the personal liability of the directors in the case at bar we bear in mind certain well established principles: (a) the directors of a business corporation are not insurers that their actions will result in pecuniary profit and they are, in the course of their duties, called upon to undertake certain calculated "business risks"; (b) for errors in judgment, exercised in good faith, the directors of a corporation should not be penalized; (c) "what may be negligence in one case may not be want of ordinary care in another, and the question of negligence is therefore ultimately a question of fact, *to be determined under all the circumstances*": *Briggs v. Spaulding,* 141 U.S. 132, 152, 11 S. Ct. 924, 931. (Emphasis supplied). Cf. *Bowerman v. Hamner,* 250 U.S. 504, 39 S. Ct. 549.

In evaluating whether or not defendants' actions render them personally liable to Manganese we bear in mind that the findings of the chancellor to the extent that such findings were approved by the court en banc, if supported of record by competent evidence, are binding upon us. However, we are not bound to accept the deductions made from the facts as found (*Liggins Estate,* 393 Pa. 500, 509, 143 A. 2d 349) nor the conclusions reached (*Pruner Estate,* 400 Pa. 629, 637, 162 A. 2d 626).

As to the findings of fact which the chancellor made and the court en banc approved, our examination reveals an abundance of competent evidence of record to support such findings. Our inquiries must be: (a) upon such findings, were the chancellor *and* the court en banc correct in concluding that the defendants acted imprudently, that they wasted corporate assets and that they performed their duties carelessly and negligently; (b) if so, was their conduct of such nature as to subject defendants to personal liability?

It can serve no useful purpose, nor do we intend, to enter upon any more detailed account of the actions than previously given; such actions are vividly portrayed on this massive record.

From creation to bankruptcy, the corporate life of Manganese spanned less than two years and, within that short period of time, its assets shrunk from over $400,000 to $30,000. Of course, this short span of corporate life and shrinkage of assets do not *per se* justify a conclusion that these defendants were guilty of any misconduct or negligence. However, a careful study of this record convinces us that the destruction of Manganese was due to the gross mismanagement of the corporation by the director-officer defendants.

Prior to Manganese' formation, these four defendants, then in sole and absolute control of Mangamex, had had the experience of operating the Paterson plant; from that experience, they knew, and had every reason to know, that the Paterson plant,—because of a lack of railroad siding, proper storage areas and other factors—could not be operated profitably. The Paterson plant operation was feasible only as a "testing" or "pilot" plant and not for full scale production. To secure additional funds, the defendants formed Manganese with a capital structure so devised that the public, the Class A stock purchasers, would put up these additional funds and the defendants, sole owners

of the Class B stock, would completely dominate Manganese' affairs.

. The manner in which the Class A stock was offered to the public. is significant when viewed in the light of subsequent events. First, the offering of such stock to the public was effected. by taking advantage of an exemption provided by the Securities Act, supra, an exemption which was *legally* available only if Manganese was "doing .business" in Pennsylvania, yet, despite the sound advice of corporate counsel given to these defendants, Manganese never did business in Pennsylvania and our reading of this record indicates that they intended, at best, only a "token" compliance with the federal statutory requirement. Second, the public which purchased the Class A stock did so in reliance upon the defendants' representations that Manganese planned that its "substantial operating activities" would be centered at the Colwyn, Pa. plant about to be purchased;[24] again, through the medium of the purchase of this plant by a small down payment of ten (10%) per cent of the purchase price, defendants simply rendered "lip service" to their representations to the stock-purchasing public and they then proceeded to deplete Manganese' assets to such an extent that it became impossible to place the Colwyn plant on any productive basis.

. In their representations to the stock-purchasing public, defendants stated the rate of production at

[24] The circular offering this stock to the. public read, inter alia: "Due to the huge demand for these materials in both foreign and domestic markets, the above output of 24 tons daily [production at Paterson plant] represents but a fraction of the sales potential. Accordingly, Manganese Corporation of America has arranged to purchase a larger plant in Colwyn, Pennsylvania for the purposes of its business wherein the substantial operating activities will be centered. In addition, it is expected that auxiliary plants will be established in the states of Florida and Texas."

the Colwyn plant would be 24 tons daily, or 480 tons per month, of manganese oxide. After eight months of Manganese operation of the Colwyn plant, a total of only 70 tons had been produced "with forty-four tons in progress, and seven thousand pounds of copper carbonate." Despite their experience with operation of this plant under Mangamex and Manganese, defendants continued to expend corporate funds on the Paterson plant and to take no action to place the Colwyn plant on a productive basis.

Defendants' actions in respect to the Colwyn plant were not the result of errors in judgment or a calculated business risk nor can such actions be classified as mere negligence. With the knowledge which defendants had of the unsuitability of the Paterson plant for profitable production, the pouring of Manganese' funds into this plant defies explanation; in fact, the defendants have failed to give any satisfactory explanation or advance any justification for such expenditures.

The chancellor found—although, apparently, the majority of the court en banc disagreed—and the record, in our view, fully supports such findings that "the unexplained use of . . . an intermediary to purchase equipment for Paterson from [Eastern] creates a reasonable inference of wilful misconduct and a pattern of self-enrichment by the managing defendants, to the prejudice of Manganese and its stockholders and militates against their good faith and fair-dealing.", that "[i]n the unauthorized payment of salaries to themselves, . . ., the officer defendants acted in violation of their duties," and that the "purchase of equipment in behalf of Manganese from Industrial Power and Equipment Co., a firm owned by Pie and Gillan, [without either approval by the board of directors or a full disclosure of the facts to the stockholders], also was improper."

This record indicates clearly that these defendants, as the controlling directors and officers, wasted and dissipated Manganese' assets. Their actions constituted negligence such as was inimical to the corporation and the other stockholders of this corporation. Whether their conduct as directors and officers be measured by the yardstick provided in §408 of the Business Corporation Law, supra, or by common law, their conduct offended their fiduciary relationship to this corporation in such manner as to justify the imposition upon them of personal liability for such conduct.

As to the liability of Selheimer, the additional defendant, we agree with the chancellor's conclusion and disagree with the conclusion of the majority of the court en banc. A review of this record reveals no basis for the imposition upon him of personal liability for his conduct. Selheimer not only protested against defendants' conduct but his protests were crystallized into actions. Selheimer disassociated himself from defendants' waste of the corporate funds and their other misconduct. Bearing in mind the weakness of his minority position and the strength of the defendants' majority positions, Selheimer did all that he could have done to divert defendants from their course of conduct.[25]

The chancellor directed that defendants reimburse Manganese[26] for its losses. Defendants were directed to make reimbursement in the sum of $382,537.30 which represents the difference between the amount realized

[25] The fact that he sold some of his own stock at a profit gave no right of action to Manganese. As Mr. Justice COHEN, speaking for this Court, stated in *Vulcanized Rubber & Plastics Co. v. Scheckter*, 400 Pa. 405, 412, 162 A. 2d 400, said: "Generally speaking, a corporation as such has no interest in its outstanding stock, or in dealings by its officers, directors or shareholders with respect thereto. [citing authorities]."

[26] See: *Beeber v. Wilson*, 285 Pa. 312, 316, 131 A. 854.

from the public sale of the Class A stocks ($412,914.50) and the amount which the receiver of Manganese realized from the sale of Manganese remaining assets ($30,377.20). In adopting this measure of damages—tantamount to attributing *all* Manganese' losses to defendants' conduct [27]—we believe the chancellor erred. The duty of reimbursement should be limited to those losses which were proximately caused by the negligent and wasteful conduct of defendants. As this Court said in *Hunt v. Aufderheide,* 330 Pa. at page 368: ". . . the value of its [the corporation's] *diverted* assets marks the maximum of its recovery." (Emphasis supplied). The record does not substantiate a finding that *all* Manganese losses were attributable to the defendants' misconduct. The nexus between Manganese' losses and defendant's negligent and wasteful actions must act as the basis for reimbursement. To establish such relationship the matter must be remanded to the court below.[28]

Decree reversed. The matter is remanded to the court below to proceed in a manner consistent with this opinion.

[27] Cf. *Niles v. N. Y. Central & H. R.R. Co.,* 176 N.Y. 119, 68 N.E. 142.

[28] Because the defendants did not all serve during the entire corporate existence of Manganese, the court below, in establishing the losses to be reimbursed, must take into consideration *which defendants* were serving as officers and directors at the time of the particular acts of misconduct.